No. 79,039
79,040

SCHMIDT, *et al.*, *Appellees/Cross-appellants*, v. HTG, INC., *et al.*,
*Appellants/Cross-appellees.*
(961 P.2d 677)

Opinion filed June 5, 1998.

*Donald Patterson,* of Fisher, Patterson, Sayler & Smith, of Topeka, argued the cause, and *Michael K. Seck,* of the same firm, of Overland Park, was on the briefs for appellants/cross-appellees HTG, Inc. d/b/a Hamilton's and Thomas E. Hamilton.

*Lisa A. Mendoza,* special assistant attorney general, argued the cause, and *Edward F. Britton, Jr.,* of Kansas Department of Corrections, was on the briefs for appellants/cross-appellees Kansas Department of Corrections and Robert Schirk.

*Timothy A. Short,* of Spigarelli, McLane, & Short, of Pittsburg, and *James F. Adler,* of Adler & Manson, L.C., of Kansas City, Missouri, argued the cause, and *Carlton Kennard, Esq.,* of Pittsburg, was with them on the briefs for appellees/cross-appellants.

The opinion of the court was delivered by

LARSON, J.: Gene and Peggy Schmidt, individually and as heirs of their daughter Stephanie Schmidt, and Gene as administrator of her estate, brought these personal injury and wrongful death actions against Stephanie's former employer, HTG, Inc. d/b/a Hamilton's, Thomas E. Hamilton, the Kansas Department of Corrections (KDOC), and Robert Schirk, a state parole officer. On June 30, 1993, Stephanie was raped and killed by Donald Ray Gideon, who had been conditionally released from prison by mandatory operation of law and was under the supervision of Schirk. The Schmidts contend that Stephanie's death was a result of the KDOC's and Schirk's failure to notify Hamilton, Gideon's employer, of defendant's prior convictions for rape and aggravated sodomy and that Hamilton negligently hired and retained Gideon as an employee. A 42 U.S.C. § 1983 (1994) claim was also made against the KDOC and Schirk.

The defendants moved for summary judgment, essentially alleging there was no duty owed to Stephanie, causation was lacking, and the KDOC and Schirk were entitled to immunity under the Kansas Tort Claims Act (KTCA), K.S.A. 75-6101 *et seq.* The trial court granted Schirk and the KDOC summary judgment regarding the Schmidts' § 1983 claims, but denied the remaining summary

judgment motions. The trial court granted permission for the defendants to file an interlocutory appeal and for the Schmidts to file their cross-appeal. The cases were consolidated and transferred to us pursuant to K.S.A. 20-3018(c).

*Factual Statement*

Donald Ray Gideon was conditionally released from prison by mandatory operation of law on November 5, 1992, having served approximately 10 years in prison for convictions of aggravated rape and sodomy of a young college woman. Prior to his mandatory release, Gideon had been denied parole at every prior parole hearing. Gideon completed the Sexual Offender Treatment Program while incarcerated.

Gideon was supervised by Robert Schirk. Schirk had worked for the KDOC for 12 years as a parole officer and had completed its basic and annual training requirements. He had previously supervised other sex offenders.

Schirk completed a Risk and Needs Assessment of Gideon to determine his level of risk and likelihood of reoffending and to establish the level of supervision he required. Gideon was assessed as high risk, although the KDOC policy so classifies all sex offenders.

When released, Gideon signed a conditional release certificate imposing certain conditions on his release. In addition to these requirements, Schirk ordered Gideon to meet with a mental health therapist and to obtain employment. Schirk possessed the inherent authority to impose additional conditions of release if warranted.

In 1992 and 1993, the KDOC had an unwritten policy which required the parole officer to give notice of a parolee's criminal history to any third party who was determined, in the parole officer's discretion, to be at risk through association with a parolee. The present policy regarding third-party notification has been reduced to writing and requires employer notification of a parolee's criminal history.

HTG, Inc. d/b/a Hamilton's opened for business in Pittsburg, Kansas, in December 1992. Hamilton had agreed to manage the restaurant for HTG, Inc. Hamilton hired and fired all employees

of the restaurant. He had extensive experience in the food service industry and had hired approximately 1,000 employees. He had never run a records check on any potential employee, nor had he ever fired, or been told to fire, anyone for falsifying an employment application.

Gideon initially was employed at Superior Industries but quit soon thereafter. Gideon then obtained employment at Hamilton's Restaurant in December 1992, without any involvement of Schirk. Gideon did not inform Hamilton of his criminal record or tell him he was on parole. Hamilton did not run a background check on Gideon before hiring him, nor did he check Gideon's references or employment history.

Hamilton also hired Stephanie, a Pittsburg State University student, who started working in December 1992. She remained employed until mid-June 1993, when she left Hamilton's after a dispute and did not return.

In February 1993, Gideon admitted to Hamilton he had been in prison and was on parole. Gideon lied to Hamilton and stated he had been incarcerated as a result of a bar fight where he had severely beaten a man with an axe handle. Hamilton never attempted to verify this story, which eventually became generally known by the other employees at Hamilton's, including Stephanie.

Hamilton learned Gideon had a parole officer and was attending counseling. Gideon informed Schirk that Hamilton knew he was on parole, but Schirk never contacted Hamilton to determine if the information divulged was correct. Hamilton had a chance meeting with Schirk at a convenience store in May or June 1993, in which Hamilton told Schirk that Gideon was doing fine at his job. Hamilton did not inquire about Gideon's conviction, nor did Schirk volunteer any information.

Hamilton never received any complaints from his employees concerning Gideon's conduct. Gideon was polite, dependable, and soft-spoken, and the waitresses seemed to like him. Stephanie told her father that Gideon was nice to her, never tried to hit on her, helped protect the waitresses' tips, and that she trusted him. Hamilton also trusted Gideon, permitting his two sons to work in the

restaurant and allowing Gideon to transport his fiancee and daughter to work.

Gideon once told Hamilton he had slapped a woman for insulting him and thrown her purse down the stairs. He also informed Hamilton he had told a woman to leave his apartment unless she had oral sex with him. On one occasion, Hamilton gave Gideon a day off work after he had been involved in a fight at a local tavern.

Schirk never informed Hamilton or any of the restaurant employees that Gideon was a paroled sex offender and stated he did not disclose this information because he was concerned Gideon would be fired. Schirk's goal was to assist Gideon in reintegrating into society, and Schirk believed society is better protected from recidivism by ensuring that parolees are employed and self-supporting. By May 1993, Schirk no longer believed Gideon would lose his employment if he informed Hamilton of Gideon's past criminal history.

Hamilton stated he would have informed Schirk of Gideon's inappropriate conduct if he had been aware of Gideon's actual criminal history. Hamilton indicated he would not have initially hired Gideon had he been aware of Gideon's true criminal history and would have informed his employees about it had he later been informed.

Schirk believed Gideon was adequately complying with the conditions of his parole. Gideon reported to Schirk as directed, maintained employment, attended counseling, made restitution and costs payments, and reported spending leisure time in appropriate pursuits. In May 1993, Gideon's supervision status was relaxed to "intermediate." Schirk indicated he might have requested the revocation of Gideon's parole had he known of the incidents of inappropriate conduct with women which Gideon had described to Hamilton.

Schirk was aware that young women were employed at Hamilton's. He acknowledged that female employees of Hamilton's were at a risk of harm due to their association with Gideon, although Schirk specifically stated he "did not feel that there was a third party at risk."

On the night of June 30, 1993, Stephanie and several friends went to a bar in Frontenac, Kansas, to celebrate her birthday. Gideon was at the bar. Stephanie became ill and accepted a ride home from Gideon. She was never again seen alive.

In the Schmidts' personal injury and wrongful death suit, they alleged the Hamilton defendants breached a duty owed to Stephanie and to them by negligently hiring and retaining Gideon as an employee at Hamilton's. The Schmidts claimed the State defendants breached both a common-law duty and KDOC policy by failing to warn Hamilton of Gideon's criminal history. The Schmidts also made 42 U.S.C. § 1983 claims against Schirk and the KDOC.

In denying motions for summary judgment, the trial court ruled against the Hamilton defendants as to their claims that they owed no duty to Stephanie or the Schmidts and that the breach of any such duty did not proximately cause the Schmidts' injuries. The court also determined that a special relationship existed between the State defendants and Gideon, in addition to KDOC policy, giving rise to a duty to warn, and rejected the State defendants' claims to immunity under the KTCA. The court did reject the Schmidts' § 1983 claims, holding the record did not support a showing of reckless conduct under the totality of the surrounding circumstances such that the court's conscience was shocked.

The trial court issued a K.S.A. 60-2102(b) order that its rulings on the summary judgment motions involved controlling questions of law as to which there is a substantial ground for difference of opinion such that an immediate appeal would materially advance the termination of litigation. The Hamilton and State defendants all appeal their adverse rulings. The Schmidts cross-appeal the dismissal of their § 1983 claims. The Court of Appeals granted permission to take the interlocutory appeals.

### Standard of review

A party is entitled to summary judgment if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." K.S.A. 60-256(c).

"Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case." *Mitzner v. State Dept. of SRS*, 257 Kan. 258, 260, 891 P.2d 435 (1995).

We are obligated on appeal to resolve all facts and inferences reasonably drawn from the evidence in favor of the party against whom summary judgment was entered. Summary judgment should be denied where reasonable minds could differ as to the conclusions to be drawn from the evidence. *Gragg v. Wichita State Univ.*, 261 Kan. 1037, 1044, 934 P.2d 121 (1997).

The trial court's rulings that the State defendants and Hamilton's owed a recognizable duty to Stephanie and that Schirk and the KDOC were not immune from liability under exceptions to the KTCA are all questions of law. See *Gragg*, 261 Kan. at 1044; *Bolyard v. Kansas Dept. of SRS*, 259 Kan. 447, 451, 912 P.2d 729 (1996). We have unlimited review of questions of law. *T.S.I. Holdings, Inc. v. Jenkins*, 260 Kan. 703, 716, 924 P.2d 1239 (1996).

### § 1983 claims

In granting summary judgment in favor of the KDOC and Schirk on the Schmidts' § 1983 claims, the trial court first noted that the Schmidts acknowledge their § 1983 claim against the KDOC is not presently allowed under the law. The trial court then held that as to the § 1983 claim against Schirk, the Schmidts had been unable to prove that their claim fell within one of the exceptions to the general rule that a State actor may not be held liable under the Due Process Clause to the United States Constitution for private misdeeds. Citing *DeShaney v. Winnebago Cty. Dept. Soc. Servs. Dept.*, 489 U.S. 189, 103 L. Ed. 2d 249, 109 S. Ct. 998 (1989), the court noted that the two recognized exceptions are: (1) the special relationship doctrine, and (2) the danger creation theory. Both the Schmidts and the trial court focused exclusively on the second exception, recognizing that the first was not applicable.

Federal courts have established the elements necessary for proving this second exception: (1) The plaintiff/victim must be a member of a limited and specifically definable group; (2) the defendant's conduct specifically put members of that group at substantial risk of serious, immediate, and proximate harm; (3) the risk was obvious or known; (4) the defendant acted recklessly in conscious disregard of that risk; and (5) the conduct, when viewed in the totality of the circumstances, is shocking to the conscience. *Collins v. Harker Heights*, 503 U.S. 115, 117 L. Ed. 2d 261, 112 S. Ct. 1061 (1992); *Medina v. City and County of Denver*, 960 F.2d 1493 (10th Cir. 1992).

The trial court decided that Schirk's conduct did not meet the elements of the danger creation theory primarily because it found his conduct was not reckless or shocking to its conscience. The court held:

"Although plaintiffs argue quite strongly that Schirk's conduct was reckless, the Court disagrees. Arguably Schirk's conduct is actionable in the traditional 'tort' sense of the word, yet the Court does not find that the record supports a showing of reckless conduct. That is, the plaintiffs have failed to demonstrate that Schirk was aware of a risk to Ms. Schmidt so great that it was highly probable that serious harm would occur. Nor have the plaintiffs demonstrated that Schirk proceeded in a conscious and unreasonable disregard of probable consequences with an intent to harm or an intent to place Ms. Schmidt in an unreasonable risk of harm. Again, it can perhaps be argued that Schirk's conduct was negligent, yet the complained of conduct falls short of that which is contemplated by a Section 1983 claim.

"The facts which were developed in the discovery phase support this conclusion. Undeniably Schirk was aware that sex offenders are at a high risk of re-offending. A logical extension of this awareness would be the knowledge that Gideon's female co-employees were at risk. Yet Schirk at that point in time had been given no reason to believe that Gideon was engaging in any inappropriate behavior which focused on the Hamilton waitresses. Gideon reported to Schirk as ordered, indicated no problems at work, and had maintained the same job for seven months. There was nothing about Gideon's known conduct which would indicate to Schirk that the Hamilton waitresses were in specific danger of imminent harm. Accordingly, the plaintiffs have been unable to demonstrate either an *intent* to harm or an *intent* to place a person unreasonably at risk of harm, as per the requirement of *Medina*, supra.

"As previously noted, the Court is required to consider the totality of the surrounding circumstances in ruling on the propriety of a Section 1983 claim. [Ci-

tation omitted.] In doing so, the Court notes that Schirk's role in the supervision of Gideon involved the balancing of competing interests: the protection of the public versus the rehabilitation of the offender. This at times is a difficult balancing act to accomplish. The Court has closely scrutinized Schirk's actions in fulfilling this role. The Court does not find that Schirk's errors, if any, are so egregious and outrageous that the Court's conscience is shocked."

The Schmidts have extensively briefed this issue and have argued that the facts of this case are comparable to many cases where § 1983 liability was imposed and distinguishable from many cases where no liability was found. We hold, however, that the trial court's analysis of this issue was sound and correct.

The trial court focused on the definition of reckless conduct "as an awareness or knowledge of an 'obvious risk that was so great that it was highly probable that serious harm would follow and he or she proceeded in conscious and unreasonable disregard of the consequences.' *Medina*, [960 F.2d at] 1496." Further, the court, citing *Collins*, 503 U.S. at 127-28, noted the shocking to the conscience standard cannot be met by ordinary negligent conduct, but rather presupposes deliberate wrongful decisions that must be more than an ordinary tort to be actionable.

In the present case, as will be further discussed, we find that Schirk owed no duty to warn Stephanie's employer of Gideon's criminal history and dangerous propensities such that liability could be imposed on a theory of negligence. As Schirk's conduct is not deemed to be negligent, it is not possible for this same conduct to be considered reckless and shocking to the conscience. Although the end result was clearly tragic, the Schmidts have failed to establish that Schirk was aware of an obvious risk so great that it was highly probable that the attack upon Stephanie would follow. Schirk most definitely did not intend any harm to come to Stephanie or Gideon's other co-workers. In light of the knowledge he possessed pertaining to Gideon's conduct during his 7 months of employment at Hamilton's, Schirk did not proceed in conscious disregard of an obvious danger.

We affirm the trial court's grant of summary judgment on the § 1983 claims.

### Duty—State defendants

The KDOC and Schirk allege that under Kansas case law, they owed no duty to warn of Gideon's criminal history and possible danger to young women. The Schmidts claimed in their petition that Schirk owed a duty to warn Hamilton, Gideon's employer, of Gideon's prior crimes, and that the breach of this duty proximately caused their injuries.

The trial court held that because Gideon was a parolee under the direct supervision of Schirk, a special relationship existed such that Schirk had a duty to warn readily identifiable groups of potential victims. Further, the court noted that because the KDOC had adopted an unwritten policy of warning individuals potentially at risk, it was required to administer the policy in an effective manner.

We have repeatedly stated that negligence only exists where there is a duty owed by one person to another and a breach of that duty occurs. In order to recover, one must show a causal connection between a duty breached and an injury received. *Durflinger v. Artiles*, 234 Kan. 484, 488, 673 P.2d 86 (1983).

"In Kansas negligence is never presumed. *Blackmore v. Auer*, 187 Kan. 434, 440, 357 P.2d 765 (1960). This court in *Blackmore* commented it may be said negligence is the failure to observe, for the protection of the interests of another person, that degree of care, precaution and vigilance which the circumstances justly demand, as a result of which such other person suffers injury. 187 Kan. at 440. Negligence is not actionable unless it involves the invasion of a legally protected interest, the violation of a right. In every instance, before an act is said to be negligent, there must exist a duty to the individual complaining, the observance of which would have averted or avoided the injury. . . . An act is wrongful, or negligent, only if the eye of vigilance, sometimes referred to as the prudent person, perceives the risk of damage. The risk to be perceived defines the duty to be obeyed, and risk imports relation; it is risk to another or to others within the range of apprehension. [Citation omitted.] The existence of negligence in each case must depend upon the particular circumstances which surrounded the parties at the time and place of the occurrence on which the controversy is based." *Durflinger*, 234 Kan. at 488-89.

Generally, in the absence of a "special relationship," there is no duty to control the conduct of a third party to prevent harm to others. *Calwell v. Hassan*, 260 Kan. 769, 778, 925 P.2d 422 (1996).

A special relationship may exist, however, with persons in charge of one with dangerous propensities or persons with custody of another. *C.J.W. v. State,* 253 Kan. 1, 8, 853 P.2d 4 (1993). We have not, in any previously reported Kansas case, extended or found a "special relationship" to exist between one conditionally released from incarceration by mandatory operation of law and the State or its duly authorized employee who is responsible to supervise such individual. We first consider whether we should do so under the facts of this case.

The Restatement (Second) of Torts § 315-20 (1965) sets forth the basic rules regarding liability for the conduct of third persons:

"§ 315 General Principle
"There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless
    (a) a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct, or
    (b) a special relation exists between the actor and the other which gives to the other a right to protection."

Comment c to § 315 provides:

"The relations between the actor and a third person which require the actor to control the third person's conduct are stated in §§ 316-319. The relations between the actor and the other which require the actor to control the conduct of third persons for the protection of the other are stated in §§ 314A and 320."

Sections 316, 317, and 318 of the Restatement relate to the duty of a parent to control the conduct of a child, the duty of a master to control the conduct of a servant, and the duty of a possessor of land to control the conduct of a licensee, respectively, and none are applicable to our case.

Section 319 of the Restatement reads:

"§ 319. Duty of Those in Charge of Person Having Dangerous Propensities
"One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm."

Section 320 of the Restatement requires those taking custody of a person to use reasonable care to control the conduct of third persons so as to prevent them from harming the person in custody.

This section does not apply to the facts of the present case, as Stephanie clearly was never in the custody of the KDOC or Schirk.

Section 319 is the only section remotely applicable to our situation. However, we find neither Schirk nor the KDOC had charge of Gideon to the extent necessary to fall within this section. The Comment to the Restatement (Second) of Torts § 319 states:

**"Comment:**

"a. The rule stated in this Section applies to two situations. The first situation is one in which the actor has charge of one or more of a class of persons to whom the tendency to act injuriously is normal. The second situation is one in which the actor has charge of a third person who does not belong to such a class but who has a peculiar tendency so to act of which the actor from personal experience or otherwise knows or should know.

**"Illustrations:**

"1. A operates a private hospital for contagious diseases. Through the negligence of the medical staff, B, who is suffering from scarlet fever, is permitted to leave the hospital with the assurance that he is entirely recovered, although his disease is still in an infectious stage. Through the negligence of a guard employee by A, C, a delirious smallpox patient, is permitted to escape. B and C communicate the scarlet fever and smallpox to D and E respectively. A is subject to liability to D and E.

"2. A operates a private sanitarium for the insane. Through the negligence of the guards employed by A, B, a homicidal maniac, is permitted to escape. B attacks and causes harm to C. A is subject to liability to C."

In refusing to grant summary judgment, the trial court primarily relied on two cases from other jurisdictions, *Division of Corrections v. Neakok*, 721 P.2d 1121 (Alaska 1986), and *Rieser v. District of Columbia*, 563 F.2d 462 (D.C. Cir. 1977), to support the belief that a special relationship exists between a parole officer and a parolee so that a duty is owed to protect third persons. We first determine if the trial court correctly concluded Schirk was "in charge of" Gideon to the extent necessary to form a § 319 special relationship and, if it did, whether the duty to protect third parties extends to and includes a duty to warn either the public at large or a limited class of persons having a current or previous involvement with the parolee.

We utilized § 319 in Kansas in *Cansler v. State*, 234 Kan. 554, 675 P.2d 57 (1984), where we found that the Kansas State Peni-

tentiary owed a duty to warn local law enforcement officers of the escape of armed and dangerous prisoners who had been in the charge of the penitentiary. This was a prison escape case, and we had no problem holding the State was in charge of seven prison escapees, all of whom were alleged to have been serving life terms after convictions for murders in various degrees. This is a far cry from imposing like obligations on the State as to every prisoner released from incarceration under parole or conditionally released by mandatory operation of law after serving a sentence less good time credits.

*Beck v. Kansas Adult Authority*, 241 Kan. 13, 735 P.2d 222 (1987), a negligence case involving a person on conditional release who committed multiple murders at the University of Kansas Medical Center, refrained from addressing the question of whether a duty to warn or control existed and rendered judgment against plaintiffs by directly addressing the question of whether the adult authority was entitled to immunity under the KTCA. Thus, the question of whether § 319 applies to those on parole such that a duty exists has not previously been directly addressed in this state.

The Alaska court in *Neakok*, 721 P.2d at 1126, relied upon by the trial court, determined that a parole officer maintained sufficient control over a parolee to create a special relationship such that a duty was owed by the State, "both because of its increased ability to foresee the dangers the parolee poses and because of its substantial ability to control the parolee." The Alaska court compared the relationship to that in *Tarasoff v. Regents of University of California*, 17 Cal. 3d 425, 131 Cal. Rptr. 14, 551 P.2d 334 (1976) (psychotherapist and patient); and *Semler v. Psychiatric Institute of Washington, D.C.*, 538 F.2d 121 (4th Cir.), *cert. denied* 429 U.S. 827 (1976) (state hospital and patient), and held the relationship between the State and a parolee was comparable to justify imposition of a duty to control his or her conduct. *Neakok* is factually different in that it involved the return of a parolee to a remote village without police officers or alcoholic counseling. It is not sufficient authority for the result reached by the trial court in the present case.

Although *Rieser*, 563 F.2d 462, did involve a parole officer and his parolee, the opinion did not comment on the application of the "special relationship" required in order for § 319 to apply. The *Rieser* court found that a parole officer owed a duty to warn potential employers of a parolee's criminal history and to place controls upon the type of work he or she could engage in. The parole officer in *Rieser* assisted a convicted rapist in obtaining employment as a maintenance worker at an apartment complex. Rieser was subsequently raped and strangled by the parolee, who had access to her apartment. On a referral form, the officer listed only that the parolee had been convicted of robbery, failed to mention that he was a suspect in three murders which had occurred at the apartment community he had previously worked at, and placed no restrictions upon the type of work appropriate to him. Due to these distinguishable facts, *Rieser* is not persuasive authority in this instance.

The most helpful case to the Schmidts' arguments as to the existence of a "special relationship" under § 319 is *Taggart v. State*, 118 Wash. 2d 195, 223, 822 P.2d 243 (1992), where it was held that "a parole officer takes charge of the parolees he or she supervises despite the lack of a custodial or continuous relationship." While this had the effect of imposing liability under § 319, we reject this overbroad construction which escalates the State's responsibility to that of the virtual guarantor of the safety of each and every one of its citizens from illegal and unlawful actions of every parolee or person released from custody under any type or kind of supervision.

The better-reasoned and more logical approach is that taken in *Fox v. Custis*, 236 Va. 69, 75, 372 S.E.2d 373 (1988), which held that state parole officers did not take charge or exercise control over a parolee within the meaning of § 319, giving rise to any "special relationship." The Virginia Supreme Court held:

"The relationship between the parolee and officer is usually continuing because parole normally is for an extended period of time. But to 'supervise and assist' during this period does not mean to assert custody in the sense that the parolee is in the personal care and control of the officer. While the record does not show the terms and conditions of Mason's parole, parolees ordinarily are essentially free

to conduct their day-to-day affairs, adhering to specific rules and reporting certain activities to the parole officer as they occur or are planned. The applicable statute does not contemplate continuing hourly or daily dominance and dominion by a parole officer over the activities of a parolee.

"Therefore we hold that the defendants did not take charge of or exercise control over Mason within the meaning of accepted rules of tort law articulated in Restatement §§ 315(a) and 319." 236 Va. at 75.

This same logic and rule has been utilized by several other states. See *Small v. McKennan Hosp.*, 403 N.W.2d 410 (S.D. 1987) (parole officer for parolee placed on maximum supervision status did not take charge of parolee so as to impose liability upon officer when parolee abducted woman from parking lot and raped and murdered her); *Lamb v. Hopkins*, 303 Md. 236, 492 A.2d 1297 (1985) (probation officer did not take charge of probationer so as to establish duty to parents of child injured in auto accident by intoxicated probationer who had known propensities to drive while drunk); see also *Seibel v. City and County of Honolulu*, 61 Hawaii 253, 602 P.2d 532 (1979).

In *Calwell v. Hassan*, 260 Kan. at 780, we recognized that we have only imposed a duty to control the conduct of third persons pursuant to § 315 in situations involving dangerous persons in a custodial setting. Furthermore, we have previously rejected application of the theory to create a duty on the part of a psychiatrist to control a patient or warn others of his or her dangerous propensities, finding no special relationship, in *Boulanger v. Pol*, 258 Kan. 289, 900 P.2d 823 (1995).

We hold no special relationship existed between the State defendants and Gideon which imposed a duty to control Gideon's conduct to prevent him from causing harm to other persons or property.

However, even if we decided that a special relationship was present between a parole officer and parolee and adopted the reasoning of *Taggart*, 118 Wash. 2d at 258, or of *Neakok*, 721 P.2d at 1128-29, we would still need to address whether the duty to control extends to a duty to warn potential victims.

*Neakok* relied on California decisions in concluding that a parole officer owed a duty to warn the members of the small community

where the parolee resided of his dangerous tendencies. Cases from California, however, have found no duty to warn in a situation much more egregious than the one in the present case. In *Thompson v. County of Alameda*, 27 Cal. 3d 741, 167 Cal. Rptr. 70, 614 P.2d 728 (1980), the California Supreme Court determined there was no relationship between a county which had granted an 18-year-old juvenile temporary leave into his mother's custody and the murdered victim of the juvenile. The court held there was no duty to warn the local police, the neighborhood parents, or the juvenile's mother that the juvenile had indicated that if released, he would take the life of a young child residing in the neighborhood.

The court noted several factors it considered when deciding whether a duty should be imposed, including

" 'the foreseeability of harm to the plaintiff, the degree of certainty that the plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.' [Citations omitted.] When public agencies are involved, additional elements include 'the extent of [the agency's] powers, the role imposed upon it by law and the limitations imposed upon it by budget.' [Citations omitted.]" *Thompson*, 27 Cal. 3d at 750.

The *Thompson* court distinguished prior cases where it had imposed a duty to warn, *Johnson v. State*, 69 Cal. 2d 782, 73 Cal. Rptr. 240, 447 P.2d 352 (1968), and *Tarasoff*, 17 Cal. 3d 425, on the ground that in each of those cases, a relationship existed between the State and the plaintiff-victim, not because of the relationship between the State and the third party. In *Thompson*, as in the present case, there was no special relationship between the State and the victim, and the court refused to impose blanket liability on the State for failing to warn. The court stated that parole and probation release is an integral and continuing part of its correctional system, serving the public by rehabilitating offenders and returning them to productive positions in society, such that "'each member of the general public who chances to come into contact

with a parolee bear[s] the risk that the rehabilitative effort will fail.' " *Thompson*, 27 Cal. 3d at 753.

Despite the fact there was an actual threat of harm in *Thompson*, the court believed there were significant practical obstacles in the imposition of a duty to warn, particularly recognizing that such a warning "may also negate the rehabilitative purposes of the parole and probation system by stigmatizing the released offender in the public's eye," 27 Cal. 3d at 755, and "might substantially jeopardize rehabilitative efforts both by stigmatizing released offenders and by inhibiting their release." 27 Cal. 3d at 757. The court believed that even warning the parents of young children in the neighborhood would be a significant drain on resources and would not likely have been any more effective.

Another California case refused to impose a duty to warn in circumstances somewhat similar to the present case. In *J.A. Meyers & Co. v. Los Angeles County Probation Dept.*, 78 Cal. App. 3d 309, 144 Cal. Rptr. 186 (1978), the court found no duty to warn a probationer's employer that the probationer was a convicted embezzler. Noting that the defendants did nothing to help the probationer acquire the job, the court found no relationship existed such that the probation department should have revealed the probationer's status and risked ruining the rehabilitative effort.

It is important to remember that the present case does not involve a situation where any specific threat of harm had been directed against any certain individual or ascertainable group. See, e.g., *Rogers v. Dept. Of Parole & Comm. Corr.*, 464 S.E.2d 330 (S.C. 1995).

In Kansas, we have addressed a duty to warn in only a few cases, all factually distinguishable from the present case. In *Cansler*, 234 Kan. 554, Syl. ¶ 3, we recognized a legal duty to warn local law enforcement authorities and area residents of major escapes of dangerous criminals. We did, however, point out that the duty to act reasonably was commensurate with the risk involved.

The situation in *Cansler* should be compared to that in *Jarboe v. Board of Sedgwick County Comm'rs*, 262 Kan. 615, 938 P.2d 1293 (1997). Although we refused to decide *Jarboe* on the ground that no duty was owed because it had not been expressly raised by

the parties, we recognized that the case could well have been disposed of on that basis. 262 Kan. at 623. In *Jarboe,* the plaintiffs never alleged that any common-law duties existed to confine the juvenile offender and warn of his escape beyond those they claimed were created by the personnel policies of the defendants. Clearly, the duty found to exist so strongly in *Cansler* diminished considerably under the factual scenario of *Jarboe.*

Our appellate courts have also examined whether a duty to warn and protect was owed in several other custodial settings, including *C.J.W.,* 253 Kan. 1; *Cupples v. State,* 18 Kan. App. 2d 864, 861 P.2d 1360 (1993); and *Washington v. State,* 17 Kan. App. 2d 518, 839 P.2d 555, *rev. denied* 252 Kan. 1095 (1992) . The duty, however, in each of these cases was premised upon Restatement (Second) of Torts § 320, the duty owed to one taken into custody, rather than upon § 319. Further, in *Nero v. Kansas State University,* 253 Kan. 567, 583, 861 P.2d 768 (1993), the court focused not on a duty owed pursuant to § 319 to control persons with known dangerous propensities, but on the University's relationship as a landlord with its tenants such that it owed a duty to use reasonable care for their protection. Thus, the duty to warn and protect discussed in cases such as these is not applicable to the present situation, where absolutely no special relationship existed between the State and Stephanie.

In the present case, the plaintiffs argue that female employees of Hamilton's were a readily identifiable potential class of victims such that they should have been warned. However, other classes of potential victims could also be identified, such as those living in Gideon's building or neighborhood, women Gideon dated, and regular patrons at bars Gideon frequented.

We further hold that even if a special relationship existed to control the conduct of Gideon, the KDOC and Schirk owed no duty under § 315 to warn Stephanie about Gideon's dangerous propensities in the absence of an express threat.

The trial court ruled that even if no special relationship existed such that the State defendants owed a duty to Stephanie to warn her of Gideon's criminal history, the unwritten notification policy created such a duty. The trial court held: "Moreover, as the Court

observed in its Finding of Fact, the DOC had adopted an unwritten policy of warning individuals potentially at risk from parolees. After adopting this policy, it then became incumbent upon the DOC to administer this policy in an effective manner." The court later went on to state: "Moreover, it can be argued that the DOC's adoption of the unwritten warning policy created a duty to those potentially and identifiably at risk. Accordingly, an alleged breach of said duty would certainly mitigate against the discretionary function exception."

In light of recent decisions by this court, this portion of the trial court's ruling is clearly erroneous. Either Schirk and the KDOC owed a duty due to the fact that they had a special relationship with Gideon, or they did not. No personnel policy, particularly not an unwritten one, can create this duty.

In *Jarboe*, 262 Kan. 615, Syl. ¶ 1, we stated that prior case law permitting a duty to be based upon the failure to follow written personnel policies had been superseded by the legislative enactment of K.S.A. 75-6104(d). Liability can no longer be established by the failure to follow such a policy unless an independent duty of care is owed to the injured party. 262 Kan. 615, Syl. ¶ 1. In *Jarboe*, the plaintiffs argued that the State defendants owed a duty in light of their failure to follow personnel policies regarding the placement and control of a juvenile offender placed in a boys' home. We found that 75-6104(d) barred imposition of such liability.

Consistent with this result and holding is our recent case of *Woodruff v. City of Ottawa*, 263 Kan. 557, 566, 951 P.2d 953 (1997), where we also rejected an argument that an unwritten policy had been created such that a police officer owed a duty to protect the plaintiffs from the conduct of a third party.

Clearly the idea that the KDOC's unwritten policy in and of itself created a legal duty on the part of Schirk and the KDOC to protect Stephanie is not viable. The holding of the trial court which so implies is not correct.

*Immunity under the KTCA*

Having determined that the KDOC and Schirk owed no duty to Stephanie to warn of Gideon's potential dangerousness, we need not base our decision on whether the KTCA provides immunity from the Schmidts' claims. However, we easily find that Schirk's conduct in failing to disclose Gideon's criminal history to his employer falls within the discretionary function exception of K.S.A. 75-6104(e).

Although governmental entities do not have discretion to violate a legal duty, we have not held that the existence of any duty deprives the State of immunity under the discretionary function exception. If such were the case, K.S.A. 75-6104(e) could never apply in a negligence action, for in order to recover for negligence, a plaintiff must establish the existence of a duty. We explicitly rejected such an argument in *Jarboe*, 262 Kan. at 631.

In *Beck*, 241 Kan. at 30-31, we extensively discussed the history of the discretionary function exception in Kansas, which need not be reiterated here. In *Hopkins v. State*, 237 Kan. 601, 610, 702 P.2d 311 (1985), we stated:

"Discretion implies the exercise of discriminating judgment within the bounds of reason. [Citation omitted.] It involves the choice of exercising of the will, of determination made between competing and sometimes conflicting considerations. Discretion imparts that a choice of action is determined, and action should be taken with reason and good conscience in the interest of protecting the rights of all parties and serving the ends of justice."

In both *Cansler*, 234 Kan 554, and *C.J.W.*, 253 Kan. 1, we held that the duty to confine prisoners or control their behavior and the duty to warn others about their dangerous propensities were nondiscretionary. Those duties were imposed by law and were ministerial. We also held in *Allen v. Kansas Dept. of S.R.S.*, 240 Kan. 620, 731 P.2d 314 (1987), that the negligent performance of a ministerial act is not within the discretionary function exception, even if the decision to perform the act is.

However, we recently decided in *Woodruff*, 263 Kan. 557, that the decision whether to take an intoxicated individual into custody is discretionary and entitled to immunity. In *Bolyard*, 259 Kan. 447, 912 P.2d 729 (1996), we ruled that SRS's decision to tem-

porarily place children with their mother was entitled to immunity under the discretionary function exception. In *G. v. State Dept. of SRS*, 251 Kan. 179, 833 P.2d 979 (1992), we held the removal of a child from a foster care home by SRS was within the discretionary function exception.

In *Beebe v. Fraktman*, 22 Kan. App. 2d 493, 921 P.2d 216 (1996), the Court of Appeals held that the decision whether to open a file for investigation of allegations of child abuse is a discretionary function. That court also held in *Burney v. Kansas Dept. of SRS*, 23 Kan. App. 2d 394, 931 P.2d 26 (1997), that the manner of conducting an investigation into a charge of child abuse is a discretionary function.

In *Jarboe*, 262 Kan. 615, we discussed how the placement decision regarding a juvenile offender was exactly the type of discretionary decision that the KTCA was intended to protect. We further quoted from *Beck*, 241 Kan. at 36-37:

"We do not believe that the legislature, in enacting the Kansas Tort Claims Act, intended to subject parole or probation decisions of the authorities, whether the Kansas Adult Authority or the sentencing judge, to litigation in order to determine whether the Authority or judge turned every tap and jumped through every hoop in arriving at a decision to place an inmate on parole or to impose conditions on a conditional release. It is these discretionary functions of state agencies or employees which the legislature intended to place beyond the pale of tort litigation.

"The possibility of harm to third persons exists every time a prisoner convicted of violent crime is released from custody and placed back into society, yet the time always arrives when release must be effected. A decision as to the imposition of conditions, if any, must be made. Such a decision involves the exercise of great discretion. Boan *had* to be released, under state law. Whether conditions might have been imposed which would have prevented this catastrophe is an open question. Hindsight, always better than foresight, indicates some conditions *might* have had some effect. But such a decision, made now, would merely second-guess the parole authority, the agency in whose hands the legislature entrusted the discretion."

In the present case, the discretionary function exception likewise applies. No duty was imposed by law upon Schirk to notify the employers of his parolees of their criminal history, even had we found a special relationship existed between Schirk and Gideon.

Furthermore, in deciding whether to inform Hamilton of Gideon's criminal history, Schirk was required to balance society's in-

terest in rehabilitating Gideon by ensuring he remained employed with the potential danger to third persons that he would reoffend. He had to weigh various risk factors, including Gideon's past and present conduct, in determining the danger posed to others. Schirk had no knowledge of any particularized threat to any of Gideon's co-workers, and as time passed, Schirk may have been less likely to believe there was a danger to such persons.

The Schmidts emphasize that Schirk admitted he was aware that Gideon's female co-workers were at high risk of danger, but still failed to notify Hamilton of Gideon's criminal history pursuant to the KDOC's third-party-at-risk policy. However, Schirk clearly stated that he did not believe the waitresses to be at such risk that they required notification under the policy. This decision is exactly the type which requires discretion, even if under current law or policy such discretion has been removed and employers are now required to be notified.

In light of what we have previously stated, we need not discuss utilization of the exception of K.S.A. 75-6104(d) to dispose of the Schmidts' claims against Schirk and the KDOC, nor do we need to consider whether the police protection exception of 75-6104(n) also applies to bar the Schmidts' claims.

The trial court's denial of summary judgment in favor of the KDOC and Schirk is reversed.

## Duty—Hamilton defendants

The Hamilton defendants argue the trial court erred in concluding they owed a continuing duty to Stephanie which still existed at the time of her death, after she had ceased working at their business of her own volition. They emphasize that Gideon caused Stephanie's injuries and death during a time in which he was not providing any services for Hamilton's, at a place completely removed from its premises, and with absolutely no nexus to the business. They claim the logical effect of the trial court's conclusion, if allowed to become the law of Kansas, "would essentially hold an employer liable to any former employee or customer for the conduct of an employee without regard to the relationship among the

parties, the passage of time, the location, or any nexus to the employer's business."

Hamilton's further cites our recent case of *Beshears v. U.S.D. No. 305*, 261 Kan. 555, 930 P.2d 1376 (1997), to argue there exists no special relationship upon which a duty to control Gideon's conduct may be based. Hamilton's contends the tragic events of this case were not foreseeable as a matter of law and asks us not to accept the broad and all encompassing "but for" argument that is contrary to our accepted principles of causation.

The Schmidts do not contend the Hamilton defendants are liable under the respondeat superior doctrine, but rather that Hamilton's negligence lies in hiring and retaining Gideon, whom Hamilton's should have known had dangerous propensities. They further contend it is a jury question whether the negligent hiring and retention of Gideon was the proximate cause of the attack upon Stephanie. The Schmidts rely in part on the Missouri case of *Gaines v. Monsanto Co.*, 655 S.W.2d 568 (Mo. App. 1983), and a string of Kansas cases dealing with the issue of negligent hiring and retention of unfit or incompetent employees.

In reaching its decision, the trial court relied on the fact that Kansas has long recognized a claim premised upon the negligent hiring and retention of an employee. Further, the court noted that employers are required to provide suitable and competent fellow servants, citing *Jackson v. City of Kansas City*, 235 Kan. 278, 304, 680 P.2d 877 (1984). The trial court distinguished this duty both from respondeat superior liability and from the duty to control the conduct of third parties set forth in the Restatement (Second) of Torts § 315, discussed in the claims against the KDOC and Schirk. The court held that the duty was abrogated when Hamilton negligently hired and continued to retain Gideon as an employee; thus, it did not matter that the injuries occurred after Stephanie was no longer an employee, at a time not during business hours, and at a place completely apart from the business premises.

The trial court found the factual situation to be similar to *Gaines*, where the plaintiffs claimed the defendant employer had been negligent in hiring and retaining an employee with dangerous proclivities who had murdered their daughter in her apartment. The em-

ployee was placed in a position where he would come into contact with female employees and learn their names and addresses. The *Gaines* opinion stated it was mindful of the adverse effect that recognizing such a cause of action would have on employment practices, but broadly held that matters of foreseeability and proximate cause were jury questions. The court held: "Generally it is sufficient to constitute proximate cause that the negligence charged was the efficient cause which set in motion the chain of circumstances leading up to the injury." 655 S.W.2d at 571.

In *Gaines*, the Missouri Court of Appeals did recognize in a footnote that "plaintiffs would not make a prima facie case of liability solely by proving that the employer actually knew of the employee's criminal record. Liability would depend, among other things, on the nature of the criminal record and the surrounding circumstances. See *Evans v. Morsell*, 395 A.2d at 484." 655 S.W.2d at 571 n.2. Additionally, another Missouri Court of Appeals panel distinguished *Gaines* in *Hollingsworth v. Quick*, 770 S.W.2d 291, 294 (Mo. App. 1989), where it was said:

"[B]ut in that case the plaintiff alleged not only that the employee had convictions for rape and assault, but the employer knew the employee had made improper and offensive advances toward fellow employees and yet did nothing when in possession of actual knowledge that retention of the employee created a potential hazard to those with whom he came in contact."

The present case is also distinguishable from *Gaines* in that here, Gideon had been described as a very polite, dependable, soft-spoken, likeable, and trustworthy employee. Hamilton's also knew of no improper or offensive behavior directed at fellow employees.

The specific finding of the trial court in the present case was that a duty existed at the time Stephanie was employed at Hamilton's to hire and retain suitable co-employees. The trial court held that whether the duty was breached and whether any alleged breach resulted in a foreseeable murder was a question for the jury.

The trial court looked to *Honeycutt v. City of Wichita*, 251 Kan. 451, Syl. ¶ 8, 836 P.2d 1128 (1992), where we said:

"In a negligence action, summary judgment is proper if the only questions presented are questions of law. To recover for negligence, the plaintiff must prove

the existence of a duty, breach of that duty, injury, and a causal connection between the duty breached and the injury suffered. Whether a duty exists is a question of law. Whether the duty has been breached is a question of fact."

The Schmidts do not contend that a "special relationship" exists as we have previously discussed herein in relation to the claims made against the State. They are not asserting that Hamilton's had a duty to control Gideon to prevent harm to Stephanie. Rather, their contention is that Hamilton's had a duty not to negligently hire and retain Gideon and that this duty was breached, thereby causing their injuries.

We have, in Kansas, broadly stated that

"a master may be liable for injuries to a third person which are the result of the incompetence or unfitness of his servant where the master was negligent in employing the servant or in retaining him in employment when the master knew or should have known of such incompetence or unfitness of the servant." *Balin v. Lysle Rishel Post No. 68*, 177 Kan. 520, Syl. ¶ 4, 280 P.2d 623 (1955).

This statement, however, specifically relates to incompetence or unfitness, and the underlying facts of the string of cases where it has been stated relate mainly to acts occurring at the employer's business location or during the conduct of the employer's business.

*Balin* involved injuries to a hotel employee who was damaged by the negligent discharge of a firearm by another hotel employee who had a prison record, worked on firearms on the premises, and at times engaged in "horseplay" around the lobby. Although cases were referred to relating to a master's negligence in maintaining a servant's employment, the evidence was held not to show that the servant was incompetent or unfit, and the master was not liable in damages to one servant for injuries inflicted on him by the act of a fellow servant. Viewed factually and focusing on the result, *Balin* provides no persuasive authority for the Schmidts' arguments in our case.

*Murray v. Modoc State Bank*, 181 Kan. 642, 313 P.2d 304 (1957), involved a suit against a bank by a customer who was assaulted by the bank's employee, Breithaupt. Murray had a bad relationship with Breithaupt and attempted to transact his business by mail. Breithaupt went to Murray's home and demanded that checks be deposited as he directed and that a property settlement

be furnished. When Murray declined, Breithaupt pulled him off his porch, punched him, threw him to the ground, and inflicted injuries on him.

In allowing recovery under these circumstances, the opinion spoke of protecting a patron invitee and stated: "The patron was as much within the portals of the bank as if he stood before the cashier's window." 181 Kan. at 649. The doctrine of respondeat superior was not involved, and the issue was whether the bank was negligent in retaining Breithaupt, who had propensities toward violence. Cases were cited where employees had assaulted other parties or co-workers and these facts were known to the employer. See *Zamora v. Wilson & Co.*, 129 Kan. 285, 282 Pac. 719 (1929) (finding no claim for tortious act against fellow employee where act not done in the promotion of the master's business or as a part of the employee's duties); *Gabbard v. Sharp*, 167 Kan. 354, 205 P.2d 960 (1955) (holding waitress not allowed to recover for assault by intoxicated fellow employee because the employee had stepped beyond the scope of his employment and was engaged in a personal venture of his own, although waitress also filed no brief and did not support her case on appeal).

The *Murray* opinion also cited *Kiser v. Shelly Oil Co.*, 136 Kan. 812, 814, 18 P.2d 181 (1933), where a jury found an employer negligent "by maintaining incompetent help and insufficient door equipment." A door had been slammed by an employee against a customer at a filling station, breaking the glass and injuring the customer. In concluding that a cause of action was alleged against the Modoc State Bank on a negligence theory, this court held that an employee "who is a quarrelsome and dangerous person is an 'unfit' person within the meaning of that term." 181 Kan. at 654.

Once again, *Murray* was a case where the location and time of the assault played a part in holding the employer liable. In the present case, Gideon's conduct while at Hamilton's was generally positive, and there existed no evidence of quarrelsome or dangerous behavior directed at fellow employees or customers.

Another case in the sequence is *Stricklin v. Parsons Stockyard Co.*, 192 Kan. 360, 388 P.2d 824 (1964), where liability attached to acts committed on the employer's premises during business

hours where an employee was given to playing pranks involving physical force upon customers. The employee had lifted Stricklin's feet while he was seated on the top of a cattle pen, causing him to fall on a concrete floor and resulting in injury.

*Stricklin* was not an intentional infliction of injuries case, and while the doctrine of respondeat superior was not involved, it was alleged the employers knew or had reason to know both of the employee's propensities for over 1 year, and of eight separate acts of "horseplay" involving physical force upon persons lawfully in and around the stockyards. Our opinion held: "[G]iving the allegations all reasonable inferences, we think it must be said that [the employee] was an incompetent and unfit employee retained by [the employers] after they knew or had reason to know of his propensities." 192 Kan. at 367.

In *Stricklin* we again have a fact situation where the conduct of the employee giving rise to the alleged negligent act occurred on the business premises during business hours and involved numerous acts of improper behavior well known to the employers. This is factually very different from the facts we face in our case.

Next in the chronological order of our Kansas cases is *Hollinger v. Stormont Hosp. & Training School for Nurses*, 2 Kan. App. 2d 302, 307, 578 P.2d 1121, *rev. denied* 225 Kan. 844 (1978). Here, the Court of Appeals limited the broad statements from *Stricklin* and *Murray* and approved the following instruction:

"[T]here must be some causal relationship between the dangerous propensity or quality of the employee, of which the employer has or should have knowledge, and the injuries suffered by the third person; the employer must, by virtue of knowledge of his employee's particular quality or propensity, have reason to believe that an undue risk of harm exists to others as a result of the continued employment of that employee; and the harm which results must be within the risk created by the known propensity for the employer to be liable."

In *Hollinger*, the plaintiff was selling and delivering newspapers to patients and employees in the hospital when a janitor, claiming to be playing a practical joke, approached her from behind and attempted to remove a newspaper from her bag, jerking it in such a manner that she was injured. The instruction referred to above was coupled with one that stated that in order for plaintiff to re-

cover, she must prove the employee was incompetent or unfit and that the defendant was negligent in employing and retaining the employee when the defendant knew or should have known of such incompetence or unfitness. While two causes of action were maintained, one under the doctrine of respondeat superior and one for failing to exercise reasonable care in the selection, employment, training, control, and retention of an employee, this case was deemed fundamentally different from *Balin, Murray,* and *Stricklin,* as follows:

"In *Stricklin,* the employer had or should have had knowledge of its employee's dangerous inclination toward pranks and practical jokes. In *Murray,* the bank had knowledge of its managing officer's violent dislike for plaintiff and his inability to control his emotions. In this case, defendant had knowledge that Rome was not doing his work properly, had displayed a lack of interest in his job, and that the haphazard way in which he did work and left his equipment around was dangerous to patients and other employees. The resulting situation is nearer that in *Balin* since there as here defendant had little or no knowledge of its employee's propensity for dangerous 'horseplay.' " 2 Kan. App. 2d at 306-07.

Although the *Hollinger* case was submitted to a jury and resulted in a verdict for the defendant, the injury did occur, once again, on the employer's premises during normal hours and was caused by an employee whose work was unsatisfactory.

*Plains Resources, Inc. v. Gable,* 235 Kan. 580, 586, 682 P.2d 653 (1984), is a factually interesting case of a "big, wild, reckless, rough, unkept" employee who sabotaged one of plaintiff's oil wells by plugging the well. Both the theories of respondeat superior and negligent hiring and retention of an incompetent or unfit employee were discussed as the basis for imposing liability on the employer as well as for awarding punitive damages. However, the actions here again took place at the place of employment, were directly associated with the employer's business, and did not occur at a social event totally removed from the employer's business or purposes.

Finally, we have our most recent decision of *Kansas State Bank & Tr. Co. v. Specialized Transportation Services, Inc.,* 249 Kan. 348, 819 P.2d 587 (1991), which involved the sexual molestation of a special education child by an employee retained by a school

district to transport students enrolled in the program. Syllabus ¶ 1 broadly states:

"When a third party asserts a negligent retention and supervision claim against an employer, liability results not because of the employer-employee relationship, but because the employer had reason to believe that an undue risk of harm to others would exist as a result of the employment of the alleged tortfeasor. The employer is subject to liability only for such harm as is within that risk. If, therefore, the risk exists because of the quality of the employee, there is liability only to the extent that the employer had reason to believe would be likely to cause harm. However, it is not necessary that the precise nature of the injury alleged by the third-party plaintiff would have been foreseen by the employer."

There were six separate issues in this complicated case, but of interest here was the sufficiency of the evidence to prove that the school district and the employer knew or should have known that an undue risk of harm would exist because of the employee's employment. The instructions were much like those approved of in the *Hollinger* case, but carried a heightened duty in stating that "all persons entrusted with children have a special responsibility to supervise their charges."

The cause of action was again based on the actions of an employee engaged in his employment and at the normal place where his employment services were rendered. When viewed in its entirety, the case does not provide a sufficient basis for us to impose upon an employer the obligation to be legally liable and responsible for the illegal acts of employees which occur at social settings away from the place of employment or to former co-workers who no longer remain in the employ of the employer. Such a result has the legal effect of making an employer the virtual insurer of the safety of former co-workers for any tortious or criminal action which an existing or even former employee may perpetrate.

In each of the Kansas cases upon which liability of the employer was predicated, the existence of a duty to the injured party was based on actions against a customer or co-worker which took place on the working premises during the time employment services were normally rendered. In none of such cases was the employee not acting in the course of employment, nor was the injurious ac-

tion removed from the employer's premises or without any nexus to the employer's operations.

None of the Kansas cases cited should be unduly extended to find that a duty comes into existence whereby an employer must ascertain the detailed history of every employee, whether criminal or not, and terminate the employment of an individual who is performing acceptable services and is clearly not unfit or incompetent, but who does pose some degree of risk due to previous actions. This case involves a tragic set of circumstances, but if a duty is found to exist here, as a matter of law, the liability of employers is unrealistically increased and the obligations of an employer become virtually unlimited.

What we have previously said severely limits our reliance on the authority of the Missouri Court of Appeals' opinion in *Gaines,* 655 S.W.2d 568, and we specifically decline to follow it as the law of Kansas. It is factually different and unduly broad in its scope and statements.

Cases can be found from other jurisdictions to support the arguments of both the Hamilton defendants and the Schmidts. While we will not attempt to compare or distinguish such cases, we believe the better reasoned view is found in cases such as *Connes v. Molalla Transport System, Inc.,* 831 P.2d 1316 (Colo. 1992) (recognizing an action for negligent hiring, but finding employer had no legal duty to conduct independent investigation into trucker's nonvehicular criminal background in order to protect a member of the public from a sexual assault committed in the course of employment), and *F & T Co. v. Woods,* 92 N.M. 697, 594 P.2d 745 (1979) (holding that in negligence action brought by rape victim against employer of alleged rapist, it was not enough that victim prove that employer was negligent in hiring or retaining alleged rapist; in addition, victim had to prove that negligent hiring or retention of alleged rapist was foreseeable and proximate cause of the rape). See generally Annot., Employer's Knowledge of Employee's Past Criminal Record as Affecting Liability for Employee's Tortious Conduct, 48 A.L.R.3d 359 and supplement thereto.

The trial court erred in finding that a duty existed on the part of the Hamilton defendants to Stephanie upon which a cause of action could be premised.

Due to the result we reach, we need not discuss the questions of proximate cause or foreseeability.

The trial court's granting of summary judgment to the KDOC and Schirk on the 42 U.S.C. § 1983 claim is affirmed. The trial court's denial of the remaining summary judgment motions of all of the defendants is reversed.