(691 P.2d 45)
No. 56,531

JIMMIE D. SCOTT and CECILIA T. SCOTT, *Plaintiffs-Appellants*, v. FORREST STRICKLAND, *Defendant-Appellee*, and JERRY WILSON, d/b/a WOODS-RINGSTAFF LUMBER COMPANY, a partnership, *Plaintiff-Appellee*, v. JIMMIE D. SCOTT and CECILIA T. SCOTT, *Defendants-Appellants*, FIRST NATIONAL BANK OF ELK CITY, KANSAS, *Defendant-Appellant*, and FORREST STRICKLAND, *Defendant-Appellee*.

Opinion filed November 21, 1984.

*Tom Crossan,* of Independence, for appellants.

*Stanley L. Basler,* of Cherryvale, for appellee Jerry Wilson d/b/a Woods-Ringstaff Lumber Company.

*Robert L. Eastman,* of Becker, Hildreth, Eastman, Gossard, Bell and Hassenplug, of Coffeyville, for appellee Forrest Strickland.

Before MEYER, P.J., REES and PARKS, JJ.

PARKS, J.: This appeal involves two cases which arose out of the same transaction and were consolidated for trial. In the first lawsuit, Jimmie D. Scott and Cecilia T. Scott brought an action against Forrest Strickland for breach of contract and breach of implied warranties of fitness and workmanship for his performance of a contract to construct a foundation and basement. Strickland counterclaimed for the amount allegedly due for the work performed. In the second lawsuit, Jerry Wilson d/b/a Woods-Ringstaff Lumber Company (lumber company), which supplied materials to the Scott job site, sought to foreclose the mechanic's lien it obtained against the Scotts' realty for an unpaid lumber bill. The First National Bank of Elk City, which holds a prior mortgage on the Scotts' property, was joined in this lawsuit as a defendant. Both cases were tried to a jury.

Testimony at trial indicated that in the summer of 1982, the Scotts, then New Jersey residents, started taking steps to retire in Kansas. They had bought some rural property in Elk County and planned to construct a log cabin on the site. Another log cabin

owner in the area recommended that they contact Forrest Strickland to construct the concrete basement. Jimmie Scott called Strickland and asked if he could build the basement. Strickland replied that he could not build one from poured concrete but that he could use concrete blocks reinforced with cement poured through the blocks. Scott sent a set of blueprints to Strickland and requested his price for the job. Other estimates supplied to Scott amounted to $13,000 to $15,000 but Strickland estimated the job's cost at about $8,000. Later Strickland contended that this price only included material and that labor would about double the total cost. The Scotts sent Strickland $5,000 and then an additional $2,000 and Strickland began work.

Since the Scotts still lived in New Jersey, Jimmie Scott asked his cousin, Roy Scott, to show Strickland the job site and monitor the progress of the work. Roy showed Strickland the site staked out by Jimmie for the basement and returned several times with a camera to take pictures of the job's progress. Roy testified that during the excavation he noticed that the stakes Jimmie had used were dislodged by the backhoe and the site seemed to have been moved. On return visits he witnessed and photographed Strickland pouring concrete over dirt without the wire mesh reinforcements called for in the blueprints and without the sand ordinarily used to line a poured concrete floor. The floor was only poured to a depth of 3 ½" to 4" deep although Strickland admitted Scott had asked for a six-inch depth.

After a phone conversation in which Scott refused to advance further funds, Strickland walked off the job on October 8, 1982, and did not return. He wrote the Scotts requesting payment of an additional $5,221 for materials used in the work completed. Jimmie Scott, who has some contruction experience and knows how to read blueprints, and Maida Parrish, who at one time operated a ready-mix concrete company, testified concerning the many alleged deficiencies in Strickland's work and the deviations from the blueprints. Some of these alleged defects included cracks in the concrete floor, failure to reinforce concrete block walls or to build them to the specified height, misplacement of windows and girder pockets, ill-constructed or absent lintels above windows and doorways and failure to vent or damp-proof the root cellar. Plaintiffs' witnesses also testified that the structure erected by Strickland was unusable and would have to be

removed before a proper basement could be built on the site. No evidence was presented to establish the expense of tearing down the structure erected by Strickland.

Plaintiffs also alleged fraud by Strickland by virtue of the discrepancy between the initial $8,000 estimate of the job and the cost eventually claimed by him. Plaintiffs sought to show that Strickland received discounts from suppliers and subcontractors which he concealed from the Scotts and that some of the materials ordered by Strickland for the Scott job were either removed from the site or never delivered to it. Plaintiffs also complained that although Strickland represented in October that outstanding bills for materials amounted to $5,200, additional debts of $3,400 to Woods-Ringstaff and $1,888 to Consolidated Oil Well Services, Inc. had been charged to the Scott job.

Following presentation of evidence, the trial court granted a directed verdict to the lumber company, foreclosing its lien and granting judgment for $3,935.63 against the Scotts. The trial court also granted a directed verdict to Strickland on the Scotts' claim for fraud and punitive damages. The jury then returned its verdict in favor of Strickland on the Scotts' claims and in favor of the Scotts on Strickland's counterclaim. The Scotts and the Bank appeal.

At the outset, we note that a brief was filed on behalf of the First National Bank of Elk City complaining that the trial court's journal entry failed to properly recognize the priority of its mortgage interest over the lien held by the lumber company. In reviewing the pretrial order filed in this case, it is clear that the parties stipulated that the bank has a valid and first mortgage against the Scotts' real estate which is senior and superior to any lien of any other parties to this action. Accordingly, we direct that the trial court's judgment be modified to reflect the priority of the Bank's interest upon foreclosure.

*Scott v. Strickland,* District Court No. 82-C-93

The Scotts sought to characterize their suit against Strickland as seeking two distinct claims for relief: the first, breach of contract for failing to complete the construction at the agreed price and the second, a breach of the implied warranty of workmanlike performance.

The common law of this state has recognized that when a person contracts to perform work or to render a service, without

express warranty, the law will imply an undertaking or contract on his part to do the job in a workmanlike manner and to exercise reasonable care in doing the work. *Gilley v. Farmer*, 207 Kan. 536, 542, 485 P.2d 1284 (1971). This implied warranty of workmanlike performance has its theoretical roots in both contract and tort law since an allegation of a breach entails the contention of both a breach of implied contract and the charge of negligence or a failure to exercise reasonable care. *Gilley*, 207 Kan. at 542. Therefore, a suit for breach of implied warranty may be premised on either a contract or tort theory of recovery or both. *Gilley*, 207 Kan. at 542.

In this case, the Scotts raised implied warranty allegations of both a contract and tort nature. They claimed that defendant Strickland breached the implied contract to perform the work in a workmanlike manner and committed a tortious breach of the duty to exercise reasonable care in doing the construction work. In addition, plaintiffs also charged that defendant breached their express oral contract to complete the basement according to the blueprints for a certain price. All three of these claims are alternative theories of relief for the damages allegedly sustained by plaintiffs on which they were entitled to plead and offer proof. However, in *Ware v. Christenberry*, 7 Kan. App. 2d 1, Syl. ¶ 7, 637 P.2d 452 (1981), this court held that in an action for breach of implied warranty, a party may plead and proceed upon the theories of both contract and tort until the facts have been developed and the case is ready to be submitted to the trier of the facts. However, one theory or the other must be elected prior to final submission of the claim to the jury. Therefore, plaintiffs were entitled to present to the jury their alternative claims for breach of the express contract and for breach of the implied warranty of workmanlike performance. They would have to choose, however, whether the implied warranty claim should be submitted as a charge of negligence or breach of an implied contract.

At best, the instructions given in this case outline the claim for breach of the express contract but only hint at a contract claim for breach of implied warranty. The instructions noted the Scotts' allegations of defective materials and faulty workmanship but did not instruct the jury that such allegations, if true, would be a breach of implied warranty. Moreover, plaintiffs' requested in-

structions and their request for punitive damages on the implied warranty claim evidence a desire to pursue the claim as a tort remedy. Punitive damages cannot be awarded for a mere breach of contract, but if there is evidence of negligence so gross as to amount to wantonness, punitive damages may be in order. *Atkinson v. Orkin Exterminating Co.*, 5 Kan. App. 2d 739, 745, 625 P.2d 505, *aff'd* 230 Kan. 277, 634 P.2d 1071 (1981). Nevertheless, despite plaintiffs' efforts to characterize their implied warranty claim in negligence terms the instructions did not define the duty to perform a contract in a workmanlike manner, or the legal definitions of negligence and proximate cause. Since all alleged damages were economic loss and not injury to person or property, comparative negligence would *not* have come into play. *Haysville U.S.D. No. 261 v. GAF Corp.*, 233 Kan. 635, Syl. ¶ 4, 666 P.2d 192 (1983). However, had the claim for negligent breach of warranty been submitted to the jury, damages would have to have been measured from a tort point of view. In short, if it can be said that the implied warranty claim was submitted to the jury at all, it was submitted on a contract rather than a tort theory of relief.

A party is entitled to instructions explaining his theory of the case· so long as evidence has been introduced in its support. *Allman v. Holleman,* 233 Kan. 781, 785, 667 P.2d 296 (1983). In the present case there was sufficient evidence of the poor quality of Strickland's work to support the choice of submitting this case to the jury as either a negligence or an implied contract claim. The implied warranty of workmanlike performance imposed a duty upon Strickland and there was ample evidence that he breached that duty. By usurping the Scotts' right to choose which of their implied warranty theories to submit to the jury, the trial court erroneously foreclosed the Scotts from a course of possible relief they had repeatedly and consciously raised. Plaintiffs are entitled to a new trial on their implied warranty claim.

The Scotts also contend that the district court erred in granting directed verdict on their claim of fraud and in refusing to permit a claim for punitive damages based on the alleged fraud.

Actionable fraud includes an untrue statement of fact, known to be untrue by the party making it, made with the intent to deceive or recklessly made with disregard for the truth, where another party justifiably relies on the statement and acts to his

injury. *Weigand v. Union Nat'l Bank of Wichita,* 227 Kan. 747, 753, 610 P.2d 572 (1980). Here, the Scotts charge that Strickland's representation in his October letter that bills for materials amounting to $5,200 were outstanding when he knew that additional amounts were due Woods-Ringstaff and Consolidated Oil was such a fraudulent statement. They also point to evidence that Strickland attempted to overcharge them for excavation work and failed to pass on a discount extended by the excavator as evidence of fraudulent intent by Strickland. Finally, the Scotts charge that Strickland misrepresented his ability to perform the construction work contracted for and that the discrepancy between the promised performance and the actual work done evidence the injury suffered by the Scotts.

In reviewing a directed verdict, we are to resolve all facts and inferences in favor of the party against whom the ruling is sought and if the evidence is such that reasonable minds could reach a different conclusion thereon the motion should be denied. *Iola State Bank v. Bolan,* 235 Kan. 175, 187, 679 P.2d 720 (1984). Applying this test to plaintiffs' evidence, we conclude that there was evidence which would suggest an intentional deception on Strickland's part which, when coupled with the alleged representation concerning his expertise, presented a sufficient showing of fraud to avoid a directed verdict. Furthermore, an instruction regarding punitive damages should have accompanied the submission of the fraud issue. *Kline v. Multi-Media Cablevision, Inc.,* 233 Kan. 988, Syl. ¶ 2, 666 P.2d 711 (1983).

We conclude that the trial court erroneously granted directed verdict on the fraud issue and prevented plaintiffs from presenting their implied warranty theory of relief to the jury. The Scotts are entitled to a new trial on this matter.

*Woods-Ringstaff v. Scott,* District Court No. 83-C-10

The case by Woods-Ringstaff against the Scotts for the cost of materials supplied to Strickland stands on an entirely separate footing from that between owner and contractor. The Scotts raise a number of technical issues concerning the validity of the lumber company's lien and they also question the judgment of the court on the merits.

Since the mechanic's lien is purely a statutory creation, only strict compliance with the provisions in the statute will give rise to an enforceable lien. *Kopp's Rug Co. v. Talbot,* 5 Kan. App. 2d

565, 567, 620 P.2d 1167 (1980). Thus, the lien statement filed by a contractor must be timely and must include: (1) the name of the owner; (2) the name of the claimant; (3) a description of the real property; and (4) a reasonably itemized statement and the amount claimed. K.S.A. 60-1102. The subcontractor's lien statement, since it depends on the privity between the owner and contractor for its validity, must also identify the name of the contractor and be filed within three months of the last date services or materials were supplied. K.S.A. 60-1103(a). Most importantly, the subcontractor's lien statement must be served upon the owner in the manner described by K.S.A. 60-1103(b). See *Construction Materials, Inc. v. Becker*, 8 Kan. App. 2d 394, 659 P.2d 243, *rev. denied* 233 Kan. 1091 (1983).

The lien statement filed by Woods-Ringstaff did not specify the lumber company as a subcontractor to Forrest Strickland as contractor, but stated that it furnished materials and labor to Jimmie D. Scott at the request of Forrest Strickland on behalf of Mr. Scott. The original lien statement was also deficient in that it only appeared to identify Jimmie Scott as owner, although the property in question is owned in joint tenancy by Cecilia and Jimmie Scott. Finally, the lien statement filed by plaintiff Woods-Ringstaff did not itemize the materials supplied, but incorporated an attachment of very poor photocopies of invoices allegedly representing the costs incurred. We turn now to determine whether any of the deficiencies alleged by the Scotts were sufficient to prevent foreclosure of the lien.

Since the Scotts hold the property in dispute in joint tenancy and the original lien statement failed to name Cecilia Scott as an owner, defendants contended that the lien could not attach to Cecilia's undivided one-half interest. Plaintiff sought to secure the entire fee with their lien and, thus, although the time for filing the lien had expired, requested leave to amend the statement to name Cecilia as an owner. The court permitted the amendment and also granted foreclosure of the lien upon the Scotts' joint interest. The Scotts essentially contend (1) that the failure of the lien to attach against Cecilia's interest when it was first filed could not be cured by an amendment beyond the original time of filing and (2) that because Cecilia was not named in the lien statement, the notice requirement was not met as against her interest.

A mechanic's lien may attach to any interest in the land held by the person for whom the materials were provided. In other words, a person holding any legal or equitable interest in realty may be an owner for the purposes of the mechanic's lien statutes. *Construction Materials,* 8 Kan. App. 2d at 398. However, the lien does not attach to any interest not held by the owner specified in the lien statement. K.S.A. 60-1105(b) permits amendment of a lien statement upon leave of court and in the furtherance of justice so long as the amount of the lien is not increased. However, a predecessor of this statute was found not to permit an amendment outside of the original time limitation on the filing of the lien which would identify a different person as owner. *Logan-Moore Lumber Co. v. Black,* 185 Kan. 644, 651, 347 P.2d 438 (1959). Despite this conclusion, the court went on to state that there is an identity of ownership between spouses such that an amendment to a valid lien against one spouse to add the name of the other spouse would be proper. Therefore, based on the authorities cited in *Logan-Moore Lumber,* we conclude that the district court correctly permitted amendment of the lien statement to name Cecilia as an owner of the property.

Defendants also contend that, even if the belated identification of Cecilia satisfied the statutory owner identification requirement, the lien still could not attach to her interest because of insufficient notice. Defendants rely on the case of *Schwaller Lumber Co., Inc. v. Watson,* 211 Kan. 141, 505 P.2d 640 (1973), where the Court construed the notice requirement contained in the statutory predecessor of K.S.A. 60-1103(b). This statute required "a copy of the lien statement to be served personally *upon the owner* and any party obligated to pay the same . . . by restricted registered or certified mail." K.S.A. 1968 Supp. 60-1103(a) [Emphasis supplied.] The Court noted that the purpose of requiring service of notice of a lien is to advise the owner of the property of the existence of the lien, afford him the opportunity to investigate the claim and determine its validity and to avoid paying the same account twice. *Schwaller Lumber,* 211 Kan. at 145. The Court concluded that this statutory requirement was not fulfilled by the service of the notice on only one of the two joint owners even though the owners are married. The Court stated that neither the marriage relationship nor the relationship of joint tenancy is sufficient to

create an agency relationship whereby service upon one cotenant will suffice to bind another. *Schwaller Lumber*, 211 Kan. 141, Syl. ¶ 5.

Defendants' reliance on *Schwaller Lumber* is misplaced in light of the changes effected in K.S.A. 60-1103 since that decision was reached. The lien statement no longer has to be served upon "the owner" but must only be delivered to "any one owner of the property." Thus, the statute now recognizes the possibility of joint ownership and inferentially overrules the conclusion of *Schwaller Lumber* that one owner is not agent for another. The statute now permits service on one owner to satisfy the entire notice to the owner requirement. Furthermore, the statute now provides that proof of actual receipt of the lien statement by the person to be served is sufficient. Since Jimmie Scott was served with notice of the lien against the property and Cecilia testified that she also saw the copy of the statement, a valid lien attached. The subsequent amendment of the statement to include Cecilia as owner clarifies that this lien was asserted against the ownership interests of both Jimmie and Cecilia.

The Scotts next contend that the plaintiff, Woods-Ringstaff, failed to specifically identify Forrest Strickland as the contractor in its lien statement. However, Strickland was named in the document as receiving the materials provided on behalf of the Scotts. Thus, the job and authority upon which the building material was provided were identified by the mere inclusion of Forrest Strickland's name. We conclude that Strickland was adequately identified as the contractor.

Finally, the Scotts complain that the lien statement was not properly itemized. K.S.A. 60-1102(a)(4) requires that a statement be given which is neither excessive nor insufficient in detail but which is fair and sufficient to inform the landowner of the claim and to enable him to ascertain whether the material was furnished and the charges fair. *Kopp's Rug Co. v. Talbot*, 5 Kan. App. 2d 565, 572, 620 P.2d 1167 (1980).

It is true that it is difficult to make out the specific descriptions and charges for all of the items listed on the invoices filed in this case. However, it can be determined that most of the materials furnished were blocks, cement, pallets or masonry—the type of materials Strickland would use on the project—and the total of each invoice can be read. In our opinion the lien statement is

reasonably itemized in that it enables the landowner to determine whether the material was furnished and whether the amount claimed is reasonable. *Kopp's Rug Co.*, 5 Kan. App. 2d at 572.

We conclude that the lien statement filed by Woods-Ringstaff was not fatally defective and that the trial court correctly ordered foreclosure of the lien. We turn now to consider defendants' final contention that the amount of the judgment entered in favor of the lumber company was erroneous.

The lumber company presented evidence that the actual unpaid cost of the materials it had supplied for use on the Scotts' property was $3,331.12. Because the invoices which record the sale of these goods include an 18% per annum interest term, plaintiff lumber company sought judgment for the cost of the materials plus 18% pre- and post-judgment interest. The trial court complied by entering judgment against the Scotts for $3,935.63 plus 18% per annum interest from the 28th day of November 1983, until the judgment was satisfied.

Plaintiff was entitled to prejudgment interest on the amount due for supplying materials to defendants' contractor because the figure owed and unpaid by Strickland was definitely ascertainable from the invoices filed with the lien statement. See *Arrowhead Constr. Co. v. Essex Corp.*, 233 Kan. 241, 251, 662 P.2d 1195 (1983). However, the rate of that interest is fixed by statute unless the parties have contracted for a different rate. K.S.A. 16-201. The mere statement of a charge in an invoice without evidence that the parties *agreed* to such a rate is not sufficient to establish a contract varying the rate of interest. *Jerry L. Phillips, Inc. v. Ratley*, 6 Kan. App. 2d 157, 160-61, 627 P.2d 339 (1981). Moreover, even if a contract rate of interest was proven by the invoices, the contract relied on was between plaintiff and Forrest Strickland. A person who is not a party to the contract cannot be bound by the interest rate stated in that agreement. *Sanders v. Park Towne, Ltd.*, 2 Kan. App. 2d 313, 321, 578 P.2d 1131, *rev. denied* 225 Kan. 845 (1978). Therefore, the trial court erred in awarding prejudgment interest at a rate different from that specified by statute.

The rate of post-judgment interest which could be assessed against the Scotts is also limited to the statutory rate since Woods-Ringstaff's claim for relief arises out of a statutory right

(the mechanic's lien) and not a contract with the Scotts. K.S.A. 16-205; *Sanders,* 2 Kan. App. 2d at 321. Therefore, the trial court's judgment was in error and should have limited the Scotts' liability to the cost of materials provided with post-judgment interest of 15% per annum (K.S.A. 1983 Supp. 16-204[c]) and prejudgment interest of 10% per annum dating from the date the mechanic's lien was filed.

Judgment is reversed in case No. 82-C-93 and remanded for a new trial. Judgment is affirmed in case No. 83-C-10 with directions to modify the judgment to only include liability for the cost of the materials used on the Scotts' land plus interest at the statutory rate and to reflect the priority of the Bank's interest upon foreclosure.