No. 94,691

JESSE D. ESQUIVEL and MICHELLE LEE ESQUIVEL, as Heirs at Law of JADON DAVID ESQUIVEL, Deceased, and JESSE D. ESQUIVEL and MICHELLE L. ESQUIVEL, as Special Administrators of the Estate of JADON DAVID ESQUIVEL, Deceased, *Appellants*, v. AARON T. WATTERS, M.D., ARK CITY CLINIC, P.A., and SOUTH CENTRAL KANSAS REGIONAL MEDICAL CENTER, *Appellees*.

(183 P.3d 847)

Opinion filed May 23, 2008.

*Will B. Wohlford,* of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, argued the cause, and *Jeffery L. Carmichael,* of the same firm, was with him on the briefs for the appellants.

*Terry L. Mann,* of Martin, Pringle, Oliver, Wallace & Bauer, L.L.P., of Wichita, argued the cause, and *David S. Wooding* and *Teresa L. Mah,* of the same firm, were with him on the briefs for appellee Aaron T. Watters, M.D.

*Peter G. Collins* and *Nancy Ogle,* of Woodard, Hernandez, Roth & Day, L.L.C., of Wichita, were on the brief for appellee South Central Kansas Regional Medical Center.

The opinion of the court was delivered by

JOHNSON, J.: Jesse D. and Michelle Lee Esquivel, the parents of Jadon David Esquivel, deceased, seek review of the Court of Appeals decision affirming the district court's granting of summary judgment in favor of Dr. Aaron T. Watters, a defendant in the parents' civil action arising from Jadon's death. Finding that summary judgment was inappropriate, we reverse.

## FACTUAL BACKGROUND

In August 2001, Dr. Watters began prenatal treatment of Michelle at the Ark City Clinic. On November 15, 2001, Michelle used a gift certificate from the Clinic to have a gender determination sonogram performed at the South Central Kansas Regional Medical Center. The ultrasound technician observed a fetal abnormality which he believed was gastroschisis, a condition in which the bowel is situated outside the body.

Contrary to standard procedure, the technician took pictures during the sonogram. The radiologist refused to review the film because a gender determination sonogram is not a diagnostic procedure. The radiologist told the technician to contact Dr. Watters, the attending physician. The technician called Dr. Watters to advise of the observed abnormality. The call was not documented in Michelle's medical records.

Dr. Watters told his assistant to call Michelle and advise her that he needed to see her right away. The assistant attempted to contact Michelle numerous times over the next several days, finally speaking with a man she believed was Jesse on November 26 and asking him to have Michelle call the doctor. The assistant did not disclose the fetal abnormality.

Michelle did not appear for her scheduled appointment on November 26, and Dr. Watters did not see her until January 4, 2002. By that time, Dr. Watters had forgotten about his conversation with the ultrasound technician. Consequently, the doctor did not discuss the fetal abnormality with Michelle or take any action to medically deal with the problem. Michelle returned on February 4 for a routine visit, during which no mention was made of the gastroschisis.

On February 8, Michelle became extremely ill and went to the hospital emergency room. The following day, Jadon was delivered by emergency Caesarean section, and the gastroschisis was discovered. Dr. Watters was out-of-town at the time and did not participate in the delivery. Neither the parents nor the delivery team had any knowledge of the suspected gastroschisis.

Jadon was stabilized to the highest capability of the South Central Kansas Regional Medical Center and then was transferred to Wesley Medical Center, where he was admitted some 5 hours after delivery. Once at Wesley, Dr. Philip Knight performed surgery on Jadon and discovered that most of the baby's bowel was dead, which rendered hopeless any chance of survival. Jadon was discharged from Wesley on February 20 and remained in hospice care at home until his death on March 3, 2002.

## PROCEDURAL HISTORY

Michelle and Jesse commenced an action against Dr. Watters, the Ark City Clinic, and the South Central Kansas Regional Medical Center. Ultimately, the district court ordered summary judgment in favor of all of the defendants. Summary judgment for the Ark City Clinic, whose radiologist refused to examine the sonogram films, was not appealed.

In granting summary judgment to Dr. Watters, the district court opined that plaintiffs had failed to present expert testimony to establish that the doctor had deviated from the applicable standard of care or that the doctor's failure to notify Michelle of the abnormal sonogram was the proximate cause of Jadon's postnatal suffering and death. In granting South Central Kansas Regional Medical Center's motion for summary judgment, the district court opined that the facility did not owe Michelle and Jesse the duty upon which they based their claims and that the claims were barred by the release form Michelle signed prior to receiving the sonogram. The plaintiffs appealed the summary judgment orders in favor of these two defendants to the Court of Appeals.

The Court of Appeals affirmed the summary judgment for South Central Kansas Regional Medical Center on both bases utilized by the district court, *i.e.*, an absence of duty and a waiver of liability.

With respect to Dr. Watters, the Court of Appeals disagreed with the district court's ruling that the plaintiffs' expert had failed to present evidence that the doctor had deviated from the applicable standard of care. However, the appellate court affirmed the holding below that plaintiffs' expert had failed to present evidence of a causal link between Dr. Watters' breach of duty and the actual injuries and damages sustained by the plaintiffs. *Esquivel v. Watters*, No. 94,691, unpublished opinion filed April 6, 2007.

Michelle and Jesse did not seek review of the Court of Appeals' affirmance of summary judgment in favor of South Central Kansas Regional Medical Center. Accordingly, we need not discuss that portion of the Court of Appeals opinion. Likewise, Dr. Watters did not cross-petition on the Court of Appeals' holding that plaintiffs presented a prima facie case of a breach of duty, *i.e.*, that the doctor deviated from the applicable standard of care. Thus, we will not revisit that question. The sole issue remaining for our review is whether the testimony of plaintiffs' expert was sufficient to establish a triable question as to whether the doctor's breach of duty caused the plaintiffs' damages.

## STANDARD OF REVIEW

Our familiar standard of review on summary judgments is often recited as follows:

" ' " 'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, we apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied.' [Citations omitted.]" ' *Scott v. Hughes*, 281 Kan. 642, 644, 132 P.3d 889 (2006)." *Korytkowski v. City of Ottawa*, 283 Kan. 122, 128, 152 P.3d 53 (2007).

When considering a summary judgment motion, both the district court and appellate court must refrain from the temptation to "pass

on credibility and to balance and weigh evidence," which are proper functions for the factfinder at trial. *Mastin v. Kansas Power & Light Co.*, 10 Kan. App. 2d 620, 624, 706 P.2d 476 (1985). "In short, '[s]ummary judgment should not be used to prevent the necessary examination of conflicting testimony and credibility in the crucible of a trial.' *Fisher v. Shamburg*, 624 F.2d 156, 162 (10th Cir. 1980)." 10 Kan. App. 2d at 624. Moreover, "[s]ummary judgment is seldom proper in negligence cases. [Citation omitted.]" *Bacon v. Mercy Hosp. of Ft. Scott*, 243 Kan. 303, 307, 756 P.2d 416 (1988).

## DISCUSSION

The following elements establish a medical malpractice case: (1) The physician owes the patient a duty of care and was required to meet or exceed a certain standard of care to protect the patient from injury; (2) the physician breached this duty or deviated from the applicable standard of care; and (3) the patient was injured and the injury proximately resulted from the physician's breach of the standard of care. *Nold v. Binyon*, 272 Kan. 87, 103, 31 P.3d 274 (2001); see *Delaney v. Cade*, 255 Kan. 199, 202-03, 873 P.2d 175 (1994).

"[N]egligence is never presumed, *Schmidt v. HTG, Inc.*, 265 Kan. 372, 382, 961 P.2d 677, *cert. denied* 525 U.S. 964 (1998), and 'may not be inferred merely from a lack of success or an adverse result from treatment. [Citation omitted.] The plaintiff in a medical malpractice case bears the burden of showing not only the doctor's negligence, but that the negligence caused the [plaintiff's] injury.' *Bacon v. Mercy Hosp. of Ft. Scott*, 243 Kan. 303, 307, 756 P.2d 416 (1988). Expert medical testimony is ordinarily required. *Delaney v. Cade*, 255 Kan. 199, 211, 873 P.2d 175 (1994)." *Nold*, 272 Kan. at 103-04.

As noted, the sole issue before us involves the causation element, *i.e.*, whether the Esquivels supplied sufficient evidence of causation through their expert, Dr. Harlan R. Giles, to avoid summary judgment. Dr. Giles' expert report contains a clear opinion that Dr. Watters' breach of duty caused the injuries to Jadon:

"In summary, it is my opinion that Dr. Watters deviated from the usual and customary standards of obstetrical practice in this case. First, he failed to make any written notation of this most important obstetrical finding. When no telephone contact was made, a written notification by registered mail would have been the

appropriate standard. Notwithstanding, even had this diagnosis been reaffirmed on January 4 or in the several visits thereafter, there was ample time to establish referral to a maternal-fetal medicine specialist and to arrange for a scheduled cesarean delivery at a tertiary center such as Wesley Medical Center.

"It is my opinion to a high degree of medical probability or certain [*sic*] that, had these steps been carried out, Jadon Esquivel would have survived intact. The 'surprise' diagnosis at delivery directly increased the probability of bowel compromise which ultimately led to his death. Although the mother did have chorioamnionitis, *there is no indication that sepsis played a role in his death and cultures were in fact negative.*"

Dr. Watters contends that Dr. Giles' responses to deposition questioning, together with the deposition testimony of Dr. Knight, fatally impeached Dr. Giles' opinion on causation. The Court of Appeals apparently agreed with that assessment of Dr. Giles' credibility, because its opinion states as uncontroverted facts that "Jadon suffered no injury to his bowel during the caesarean procedure" and that "[Dr.] Knight determined that Jadon's bowel had been dead for weeks prior to his birth." Slip op. at 8. We perceive that both facts were disputed.

During Dr. Giles' deposition, Dr. Watters' attorney elicited that Dr. Giles believed that, even at the February 4, 2002, perinatal visit, it was not too late for Dr. Watters to make a timely referral to a perinatologist and arrange for Jadon's delivery at a tertiary facility, such as Wesley, where the delivery team would be prepared to deal with the gastroschisis. Dr. Giles opined that the surprise diagnosis at delivery directly increased the probability of bowel compromise which ultimately led to Jadon's death, explaining:

"A.   Well, when we do a Caesarian section for gastroschisis, we first do an ultrasound to localize the rotational attitude of the fetus; is the abdomen up or down.

"In that case so that in delivering the baby and delivering the head, one can reach carefully with the gloved hand to the bowel and brace it while you're bringing it back through the constriction of the uterine incision. This minimizes the chance of torsion, which in fact is the most common reason why bowel is dead or infarcted. If you don't know it's coming, you just deliver the baby in the routine fashion and let the bowels trail wherever they may be."

Dr. Watters relies on the following exchange between his attorney and Dr. Giles to argue that it was uncontroverted that his failure to refer his patient was not the cause of the injuries:

"Q. Do you have any evidence from the medical records or the testimony that you've read, including that of Dr. Knight, that would suggest that anything related to the delivery itself caused or contributed to the dead bowel in this case?

"A. No, I can't think of anything concrete."

However, immediately following that exchange, Dr. Giles answered affirmatively to the question "is it your opinion that the delivery without the diagnosis of gastroschisis in mind caused or contributed to this child's death." He again explained how the bowel damage occurs during a "surprise" delivery. In other words, notwithstanding the cross-examination, Dr. Giles still held his opinion, to a reasonable degree of medical certainty, that Dr. Watters' breach caused the injuries. The fact that Dr. Giles did not personally observe the delivery or have other "concrete" proof of what exactly happened to the bowel during delivery would go to the weight of the expert's testimony. It would not render the expert's testimony so incredible as to justify summary judgment.

The Court of Appeals put great stock in its conclusion that the child's bowel had been dead for weeks prior to delivery. Apparently, the court drew the inference that any damage inflicted upon the bowel during delivery could not have been the proximate cause of death because of the prior necrosis. The court then concluded that "Knight's expert medical opinion on the condition of Jadon's bowel constitutes evidence that there was no causal link between Watters' conduct and Jadon's injuries." Slip op. at 9. That holding is problematic on multiple levels.

First, Dr. Knight did not testify as an expert. Before Dr. Knight's deposition commenced, his attorney announced "that Dr. Knight has indicated—and he was subpoenaed here or asked to be here strictly as a treating physician—he does not have any opinions on standard of care or causation; he'll just tell you what he saw, [and] did with this child." Dr. Watters' attorney responded: "Perfectly acceptable. Perfectly acceptable." Throughout the deposition, the various participants reiterated a number of times that Dr. Knight was a fact witness and would not testify as an expert at trial, including on the issue of causation.

Furthermore, Dr. Knight's purported "expert medical opinion" appears to be based upon an off-hand remark, during the following exchange:

"Q. The necrosis of the bowel in this case, do you know from your observation of this patient when that process began?

"A. No.

"Q. Is there any fact that you can look to in any record that would tell you or help you to deduce when that necrosis began to occur?

"MR. HERNANDEZ [Dr. Knight's attorney]: Object to the form, from the standpoint that he said the only record he has is what's in front of him, the operative report.

"A. I could not tell at the time the baby was born, in the newborn period, when it occurred, no. But it was not something that happened, you know, days before, it would have been weeks before."

Pointedly, Dr. Knight's operation report, which included a section entitled "Operative Findings," did not mention that the child's bowel had been dead for weeks. When Dr. Giles was confronted with Dr. Knight's purported opinion that Jadon's bowel had been dead for a month prior to delivery, Dr. Giles opined that "the findings [Dr. Knight] described in his operative report would not be consistent with something dead for a month." Thus, the question of when the necrosis occurred was not an uncontroverted fact, as suggested by the Court of Appeals opinion.

Moreover, a fundamental rule of summary judgment is that the inferences which may reasonably be drawn from the evidence must be resolved in favor of the party against whom the ruling is sought. *Korytkowski*, 283 Kan. at 128. Dr. Knight did not testify that the predelivery necrosis of the bowel was the proximate cause of Jadon's death. By drawing that inference from Dr. Knight's deposition testimony as a fact witness, the Court of Appeals resolved the matter in favor of the summary judgment movant, Dr. Watters, rather than in favor of the parties against whom summary judgment was sought, the plaintiffs.

In conclusion, we hold that the plaintiffs provided expert testimony on causation and that expert opinion was not rendered incredible by the testimony of a fact witness, so that the unusual remedy of summary judgment on the fact issue of causation was erroneous.

Reversed and remanded for further proceedings.

NUSS, J., not participating.

LEBEN, J., assigned.

BEIER, J., dissenting: I agree with the majority that any variance in the degree of specificity Dr. Knight recorded in his operative report on the vintage of Jadon's bowel necrosis and that to which he testified at his deposition did not transform him into an expert rather than a fact witness. It also did not conclusively dispose of any genuine issue of material fact, and it did not eliminate the possibility that plaintiffs could prove Dr. Watters' breach of the standard of care caused plaintiffs' injuries. If anything, Dr. Knight's oral elaboration on his written record gave plaintiffs a weakness they could have exploited to their advantage at trial. They could have argued any variance was indicative of Dr. Knight's bias, of one physician consciously or unconsciously covering for the mistakes of another.

That being said, I must dissent. Although plaintiffs do not lack an expert opinion on causation, that opinion exists in a evidentiary vacuum.

Dr. Giles is clearly capable of describing the problems that *may* arise when a physician performing a Caesarean section is unaware of gastroschisis in the baby he or she is delivering. But neither he nor the plaintiffs point to any documentary or testimonial evidence that such problems *did* arise in this case.

When defending a motion for summary judgment, a party cannot rest on mere theory. It must come forward with facts that support the theory. If plaintiffs were capable of doing so here, they did not demonstrate that ability on this record. I would therefore affirm.

MCFARLAND, C.J., joins in the foregoing dissent.