(187 P.3d 111)
No. 98,762

ALLIANCE STEEL, INC., *Appellant*, v. TROY PILAND; TERRENCE PILAND; DOUGLAS GROOMS, d/b/a ASSOCIATED CONSTRUCTION SERVICE, and/or ASSOCIATED CONSTRUCTION SERVICE; and ROBERT D. DUNLAP, d/b/a DUNLAP CONSTRUCTION, *Appellees*.

Opinion filed June 27, 2008.

*Douglas M. Crotty*, of Crotty Law Office, P.A., of Garden City, and *Ross A. Plourde*, of McAffee & Taft, of Oklahoma City, Oklahoma, for appellant.

*William I. Heydman*, of Heydman Kliewer, LLP, of Garden City, for appellees Troy and Terrence Piland, and *Gerald O. Schultz*, of Law Offices of Gerald O. Schultz, of Garden City, for appellee Robert D. Dunlap, d/b/a, Dunlap Construction.

No appearance by appellee Douglas Grooms, d/b/a Associated Construction Service, and/or Associated Construction Service.

Before LEBEN, P.J., MALONE and GREENE, JJ.

GREENE, J.: In this litigation regarding the enforceability of a mechanic's lien, material supplier Alliance Steel, Inc. (Alliance), appeals the district court's summary judgment in favor of the own-

ers of the realty, Troy and Terrence Piland (the Pilands), holding that Alliance's lien was defective because it listed an incorrect person as general contractor and was not timely filed. Alliance challenges these holdings and also argues there was a genuine issue of material fact on the identity of the general contractor, thus making summary judgment improper. We disagree with the district court as to the untimely filing, but we affirm on the bases that there was no genuine issue of material fact as to the identity of the general contractor and Alliance's lien was fatally defective due to its failure to designate that contractor on its lien statement as required by Kansas law.

### *Factual and Procedural Overview*

The Pilands own realty in Finney County and desired to construct a metal building on their property. Douglas Grooms, d/b/a Associated Construction Service and/or Associated Construction Service (collectively Grooms) submitted three separate bids for the project, each on behalf of a different company. The bid ultimately accepted by Pilands was presented by Robert D. Dunlap, d/b/a Dunlap Construction, whom Grooms involved because Grooms had no general contractor's license in Finney County. Dunlap and Grooms were both involved in the project thereafter, and the precise relationship between these parties is the crux of this litigation. Grooms arranged for the steel building materials with Alliance, however, and listed himself as the general contractor on Alliance's jobsite information sheet.

Alliance filed its mechanic's lien on December 17, 2003, listing Grooms and his company as the general contractor. The lien statement indicated that the last date materials were delivered to the jobsite was "on or about September 16, 2003," but it was undisputed that critical fasteners did not arrive and were not installed until September 26, 2003.

Alliance sought to foreclose its lien in Finney County district court in late 2003, but the Pilands were successful in dismissing that action based on the failure of Alliance to be registered to do business in Kansas. That dismissal was reversed by this court in *Alliance Steel, Inc. v. Piland*, 35 Kan. App. 2d 728, 134 P.3d 669

(2006). On remand, the Pilands moved for summary judgment based on lien defects. The district court granted summary judgment to the Pilands, concluding in material part:

"7. Clearly the Mechanic's Lien in our case was filed on its face outside the 3-month limit set out in statute.

. . . .

"9. The Mechanic's Lien identifies Douglas Grooms as the Contractor. The positions of all the defendants in this case are that Robert Dunlap was the General Contractor for this building project.

. . . .

"[10] e. There is no representation made by Plaintiff that they contacted either the property owner or Mr. Dunlap and were misinformed as to who was the Contractor. No evidence has been presented that contact was made to the inspection department to identify who the building permit was issued to. Representation made by Plaintiff that Mr. Grooms represented himself out as the Contractor is directly contrary to the sworn statement of Mr. Grooms submitted to the Court as an attachment to the Defendant Piland's 'Response to Plaintiff's Statements Regarding Uncontroverted and other Facts'.

"[10] f. Based upon the uncontroverted facts and taking in the light most favorable to the Plaintiff, the statements purporting to identify the role of Mr. Grooms as a Contractor, the Court finds beyond a preponderance of the evidence that there was one and only one General Contractor and that was Robert Dunlap. Mr. Grooms did not have the credentials nor the capacity to act in the capacity of a Contractor for this construction project. The entire job history of that Mr. Grooms as set out by Plaintiff, run in contradiction to the claim that he was the Contractor on this project."

Alliance appeals.

## *Standards of Review*

" ' " 'Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. The trial court is required to resolve all facts and inferences which may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, [appellate courts] apply the same rules and where we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judg-

ment must be denied.' " ' [Citations omitted.]" *Korytkowski v. City of Ottawa*, 283 Kan. 122, 128, 152 P.3d 53 (2007).

Whether a mechanic's lien statement complies with statutory requirements is a question of law over which appellate review is unlimited. *Buchanan v. Overley*, 39 Kan. App. 2d 171, Syl. ¶ 1, 178 P.3d 53 (2008); see K.S.A. 60-1102.

### Overview of the Law of Mechanics' Liens in Kansas

The purpose of a mechanic's lien statute is to provide effective security to any persons or entities furnishing labor, equipment, materials, or supplies used or consumed for the improvement of real property under a contract with the owner or the owner's general contractor. The theory underlying the granting of a lien against the property is that the property improved by the labor, equipment, materials, or supplies should be charged with the payment of the labor, equipment, materials, or supplies. *Haz-Mat Response, Inc. v. Certified Waste Services Ltd.*, 259 Kan. 166, 170, 910 P.2d 839 (1996). Mechanics' liens are statutory in origin and claimants must bring themselves clearly within the provisions of the statutes in order for their liens to attach. *Kansas City Heartland Constr. Co. v. Maggie Jones Southport Cafe, Inc.*, 250 Kan. 32, 34, 824 P.2d 926 (1992). Once a lien has attached, however, the mechanics' lien statutes are construed liberally in favor of the claimant. *Holiday Development Co. v. Tobin Construction Co.*, 219 Kan. 701, 704-05, 549 P.2d 1376 (1976).

K.S.A. 60-1102 does not require the filing of any particular form of a mechanic's lien statement, only that the requisite information be included and be fully verified. The lack of a verification in the statement filed necessarily defeats the lien. *Kansas Lumber Co. v. Wang*, 12 Kan. App. 2d 20, 22, 733 P.2d 1266 (1987). Mechanics' lien statements may incorporate by reference information in attachments, so long as they contain the requisite information and are fully verified. K.S.A. 60-1102(a)(1)-(4).

Kansas mechanics' lien statutes apply not only to the original contractor but also to those under an agreement with the contractor, subcontractor, or owner contractor. K.S.A. 60-1103. Because there is no privity of contract between a subcontractor and a prop-

erty owner, however, a subcontractor can obtain a lien only by complying with the statutory provisions. It is not enough that he or she has furnished material and filed a lien statement. See *D.J. Fair Lumber Co. v. Karlin*, 199 Kan. 366, 369, 430 P.2d 222 (1967); *Tradesmen Int'l, Inc. v. Wal-Mart Real Estate Business Trust*, 35 Kan. App. 2d 146, 129 P.3d 102, *rev. denied* 281 Kan. 1382 (2006). The key distinction for liens by suppliers and subcontractors is that the lien statement must state the name of the contractor. K.S.A. 60-1103 (a)(1).

For purposes of our analysis herein, the material aspects of the statutory scheme are as follows:

K.S.A. 60-1102 provides in material part:

"(a) *Filing.* Any person claiming a lien on real property, under the provisions of K.S.A. 60-1101, and amendments thereto, shall file with the clerk of the district court of the county in which property is located, within four months after the date material, equipment or supplies, used or consumed was last furnished or last labor performed under the contract a verified statement showing:

(1) The name of the owner,

(2) the name and address sufficient for service of process of the claimant,

(3) a description of the real property,

(4) a reasonably itemized statement and the amount of the claim, but if the amount of the claim is evidenced by a written instrument, or if a promissory note has been given for the same, a copy thereof may be attached to the claim in lieu of the itemized statement."

K.S.A. 60-1103 provides in material part:

"(a) *Procedure.* Any supplier, subcontractor or other person furnishing labor, equipment, material or supplies, used or consumed at the site of the property subject to the lien, under an agreement with the contractor, subcontractor or owner contractor may obtain a lien for the amount due in the same manner and extent as the original contractor except that:

(1) The lien statement must state the name of the contractor and be filed within three months after the date supplies, material or equipment was last furnished or labor performed by the claimant."

### *Did the District Court Err in Finding the Alliance Lien Defective Due to Untimeliness?*

Alliance first urges us to conclude that its lien was not untimely. The district court's findings on this issue included the following:

"K. That, on December 17, 2003, [Alliance] filed a verified Statement of Lien Claimant for Materials with the Clerk of the Finney County District Court . . . .

. . . .

"N. That the Lien Statement indicates materials were last furnished by the Plaintiff to Grooms on September 16, 2003.

"O. That the period of days between September 16, 2003, through December 17, 2003, not including September 16, 2003, is 91 days.

"P. That three (3) months from September 16, 2003, is December 16, 2003.

. . . .

"Aa. On September 23, 2003, approximately 1000 fasteners were delivered by Alliance to the jobsite.

"Bb. The fasteners 'are very important' and are not incidental to the building supplied by Alliance.

. . . .

"Ee. The statement in Alliance's lien affidavit that September 16, 2003 was the last date materials were delivered to the jobsite was simply wrong."

Based on these facts, the district court concluded that the lien was defective "on its face" because filed outside the "3 month limit set out in statute." Alliance argues that so long as it was filed within 3 months of the last date materials or labor were provided, its lien was timely filed, without regard to an incorrect "on or about" date on the lien statement. We agree.

Obviously, the district court's focus was the date stated on the lien statement rather than "the date supplies, material or equipment was last furnished or labor performed by the claimant." See K.S.A. 60-1103(a)(1). Although the statute requires timely filing, it does not require the lien statement to include the last date materials or labor were provided. K.S.A. 60-1103(a)(1) requires only the name of the contractor, and K.S.A. 60-1102(a) does not require any inclusion or verification of the date supplies or labor were last furnished.

We recognize that timely filing is critical to the validity of the lien. See, *e.g., Holiday Development Co.*, 219 Kan. at 706-07, and the cases collected therein. Alliance correctly asserts that any statement in the lien as to last work date may be contradicted by the evidence, relying heavily on *Manhattan Mall Co. v. Shult*, 254 Kan. 253, Syl. ¶ 2, 864 P.2d 1136 (1993), where our Supreme Court held:

"In a mechanic's lien foreclosure case, the trial court is not required to accept a contractor's statement concerning the last work date if that statement is contradicted by the evidence. The test as to when a piece of work is completed in order to preserve a mechanic's line under K.S.A. 60-1101 *et seq.* is whether the unfinished work was part of the work necessary to be performed under the terms of the original contract to complete the job and comply in good faith with the requirements of the contract."

In their attempt to distinguish *Manhattan Mall*, the Pilands suggest the opinion "concerned itself with the factual issue of the 'last date materials were supplied.' " Precisely. And here the facts are not disputed; the last date labor or materials were supplied to this project was September 23, 2003, making the lien filing on December 17, 2003, timely. For purposes of determining the timeliness of a mechanic's lien under K.S.A. 60-1101 *et seq.*, it is not fatal to the lien for the lien statement to have an erroneous date for the time materials or labor were provided, so long as the filing date is within the time specified by the applicable statute from the actual date materials or labor were last supplied by the claimant.

We conclude the district court erred in finding the lien statement to have been untimely filed.

### Did the District Court Err in Concluding There Was No Genuine Issue of Material Fact Regarding the Identity of the Contractor for Purposes of the Lien Statement?

Alliance next argues the district court erred in granting summary judgment to the Pilands when there existed a genuine issue of fact as to the identity of the contractor for the project. This purported fact question was critical inasmuch as the lien statement listed Grooms as the contractor rather than Dunlap, and it was deemed defective by the district court for its failure to comply with the statutory requirement that the contractor be named in the lien statement under K.S.A. 60-1103(a)(1).

In finding no genuine issue of material fact, the district court made the following material findings:

"G. That, at all pertinent hereto, Grooms was not a licensed contractor in Garden City, Finney County, Kansas.

"H. That [Alliance] did provide materials, the construction project was completed; and the Pilands paid Dunlap in full pursuant to Piland's contract with Dunlap.

. . . .

"L. That the Lien Statement names 'Douglas Grooms, d/b/a Associated Construction Service, and/or Associated Construction Service' as the 'General Contractor.'

"M. That the Lien Statement does not state the name of Dunlap in any way.

. . . .

"T. Grooms did not have a written contract memorializing his role in the project with Dunlap.

"U. . . . . [B]ecause Grooms did not have a general contractor's license, Grooms arranged for Dunlap to act as general contractor.

. . . .

"Y. Grooms prepared the building site plan.

"Z. Grooms was liaison to the customer."

As noted above, based on these facts the district court concluded that "a preponderance of evidence" established that "there was one and only one General Contractor and that was Robert Dunlap." Alliance emphasizes on appeal that the court's reference to the preponderance of the evidence indicates a weighing of the evidence that is not permitted in an appropriate summary judgment analysis. We generally agree that weighing of the evidence is inappropriate in the context of a summary judgment motion, but we must determine if the district court did, in fact, weigh the evidence or merely determine that any inference that Grooms was a "contractor" could not be reasonably drawn from all the evidence presented. After an extensive review of the summary judgment pleadings and all testimony referenced therein, we conclude that Grooms' own testimony defies any reasonable inference that he was a contractor for the project.

Rather than discuss the detail of uncontroverted fact statements and responses here, we move directly to the deposition testimony of Grooms explaining his role on this project (as properly cited and attached by Alliance in its summary judgment pleadings) to determine whether there could be drawn any reasonable inference that Grooms was, in fact, a contractor on this project. His testimony, in material part, includes the following:

"Q. And [the Alliance jobsite information sheet] says that the general contractor's name and address is Associated—

"A. Construction Service.

"Q. Okay. Is that your company?

"A. It was what I tried to make a company.

. . . .

"Q. Was that accurate?

"A. Yes.

"Q. Tell me why you—

"A. Well, *no, this is not accurate* because I filled this out wrong because *Mr. Dunlap's company was the actual general contractor.*

. . . .

"Q. Tell me why you thought you were the general contractor or why you put down here, attempting to be honest, why you put that down here?

"A. Because I was linked into it, I, you know, I guess.

"Q. How were you linked into it?

"A. Well, I was doing business with Mr. Dunlap, I did not hold a general contractor's license at the time so we were doing it through Mr. Dunlap's general contractor's license.

. . . .

"Q. Tell me what your various roles were.

"A. I did all of the estimating and was liaison to the customer basically. Mr. Dunlap poured the concrete and we had somebody else set the steel up.

. . . .

"Q. *So you needed somebody to do the general contracting?*

"A. *Yes.*

"Q. And did you contact—excuse me—contact Dunlap to do that?

"A. Yeah.

. . . .

"Q. When the project began, what involvement did you have in the project after the bid was accepted and his job began?

"A. I oversaw it, made sure that the dirt work was properly done, which Mr. Dunlap did that, and the concrete was placed properly and the building was erected properly.

. . . .

"Q. Was there an understanding between you and Mr. Dunlap as far as whose responsibility—what your responsibilities would be versus what his responsibilities would be?

"A. I don't recall.

. . . .

"Q. And is it true that you viewed yourself as doing [the formal bid to the Pilands] with Mr. Dunlap?

"A. Yes.

"Q. You said earlier and I guess I had asked you, what does that mean when you say your doing it with Mr. Dunlap?

"A. Working as an equal, being equal in responsibility for getting the project done."

. . . .

"Q. *Do you have any responsibility to the owner except to Mr. Dunlap?*

"A. *No.*

"Q. *And you had no contract with the owner in any regard, correct?*

"A. *Correct.*

"Q. *And you did not have an agreement with Mr. Dunlap that you were going to be a general contractor, did you?*

"A. *No.*" (Emphasis added.)

Terry Piland testified consistent with Grooms in stating that his contract was exclusively with Dunlap and that his understanding of Grooms' role was: " 'He's the person that helped [Dunlap] on the building.' " Dunlap testified that it was Dunlap Construction that was the contractor ultimately responsible for carrying out the terms of the contract, and the written contract itself is unequivocally between Terry L. Piland and Dunlap Construction, with no mention of Grooms or his company.

Resolving all facts and inferences which may reasonably be drawn from the evidence in favor of Alliance, does Grooms' testimony create a genuine issue of material fact as to his being a contractor for the project? We think not. Could reasonable minds differ as to the conclusion drawn by the district court from the evidence? Again, we think not. Taking Grooms' testimony in the best light, he thought he was "linked into" the project or considered himself an "equal" with Dunlap, having primary responsibility for some aspects of the project, but *at no time did he so much as suggest any contractual relationship with the Pilands.* In fact, he clearly and unequivocally conceded that he had no responsibility or any contractual relationship with the Pilands. His own views of "linkage" or shared responsibility simply cannot make him a contractor in the absence of an agreement with the owners.

Alliance urges us to recognize that there can be more than one contractor on a construction project and that no writing is necessary to demonstrate such a relationship, citing *Stewart v. Cunningham*, 219 Kan. 374, 548 P.2d 740 (1976). We have no quarrel

with these principles, but our Supreme Court clearly held in *Stewart* that "[a] contractor is one who furnishes labor or materials *under a contract direct with the owner* for the improvement of property." (Emphasis added.) 219 Kan. 374, Syl. ¶ 1. The critical fact making one a contractor is his or her relationship to the owner; mere relationships by and between those who provide materials or labor to a project can never create "contractor" status for purposes of a Kansas mechanic's lien without a contract—express or implied—with the owner. Indeed, in *Stewart*, the linchpin of the decision to recognize a second contractor was a separate contract directly with the owner. 219 Kan. at 378.

Grooms' testimony, taken in the light most favorable to Alliance's position that he was, in fact, a "contractor" for the project does not create a *genuine* issue of material fact. The term "genuine" means precisely that; there must be a reasonable factual inference in favor of the nonmoving party. As one treatise defines genuine for these purposes:

"A genuine issue . . . of material fact has been variously described as a 'triable,' 'substantial,' or 'real' issue of fact, and has been defined as one that can be maintained by substantial evidence. It has also been held that 'genuine' in this context means that the evidence is such that a reasonable jury could resolve the fact in the manner urged by the nonmoving party. For a factual issue to be considered genuine, *it must have real basis in the record*, and it must be supported by substantial evidence.

"On the other hand, to justify departure from the course of the trial of an issue of fact and the award of summary judgment, the court must be convinced that the issue is not genuine, but feigned, so that there is nothing to be tried. *It is incumbent upon the court to search the proof as proffered by affidavits or otherwise, to ascertain whether it discloses a real issue, rather than a formal, perfunctory, or shadowy one.* Evidence that is too incredible to be accepted by reasonable minds does not raise a genuine issue of fact." (Emphasis added.) 73 Am. Jur. 2d, Summary Judgment § 47, pp. 688-89.

Alliance failed to raise a genuine issue of fact on the issue of who was the contractor for the project for purposes of Kansas lien law. The district court may have used unfortunate language in characterizing its decision as based on a "preponderance of evidence," but we have no difficulty in concluding the decision was quite correct. Construing the totality of the evidence presented in the light

most favorable to Alliance, there was no contractual relationship between Grooms and the Pilands to establish Grooms as a contractor for purposes of Kansas lien law.

### Did the District Court Err in Finding the Lien Statement Defective for Failure to State the Contractor?

Finally, Alliance argues the district court erred in concluding the lien statement was defective due to its failure to identify the general contractor. We note at the outset that K.S.A. 60-1103(a)(1) clearly provides: "The lien statement must state the name of the contractor."

Alliance argues, however, that our appellate courts have not been consistent in addressing this issue. Alliance conceded that in *Tradesmen*, 35 Kan. App. 2d at 148, our court held that "a mechanic's lien statement filed by a subcontractor under K.S.A. 60-1103(a)(1) that fails to correctly name the contractor is [fatally] defective." Alliance suggests, however, that a conflicting result was reached in *Scott v. Strickland*, 10 Kan. App. 2d 14, 23, 691 P.2d 53 (1984), but we disagree.

In the *Strickland* case, the lien statement failed to specifically identify Strickland as the contractor, but Strickland was named in the document as receiving the materials provided on behalf of the owners. The court concluded that Strickland "was adequately identified as the contractor." 10 Kan. App. 2d at 23. In contrast, here there was no identification whatsoever in the lien statement as to Dunlap being the contractor. We perceive no conflict between these cases, nor do we read *Tradesmen* as other than entirely consistent with other prior cases. In fact, the court in *Tradesmen* took great pains to carefully distinguish *Strickland*. See 35 Kan. App. 2d at 153-56.

We agree with the rationale and result of our brethren in the *Tradesmen* case and adopt *Tradesmen* in support of our conclusion here that the district court committed no error in holding the lien statement defective for failure to state or otherwise identify the contractor on the project:

"[W]e look only to whether a lien claimant followed the statutory requirements to create a valid lien on the property. Here, by not following an essential requirement of K.S.A. 60-1103 to name the proper contractor, Tradesmen failed to bring itself within the statutory provisions to file a valid mechanic's lien.

"Our Supreme Court has held that a mechanic's lien statement filed by a subcontractor which fails to state the name of the contractor is fatally defective. *Badger Lumber & Coal Co. v. Schmidt*, 122 Kan. 48, Syl. ¶ 1, 251 Pac. 196 (1926)." *Tradesmen*, 35 Kan. App. 2d at 157.

Here, Alliance's lien statement listed Grooms and his company as the general contractor of the metal building. This was simply not correct. In order for Alliance to create a valid lien, it was required to file a lien statement in the precise manner prescribed by the statute and in no other manner. See *Creme de la Creme (Kansas) Inc. v. R & R Int'l, Inc.*, 32 Kan. App. 2d 490, 493, 85 P.3d 205, *rev. denied* 278 Kan. 844 (2004). A supplier's lien statement is absolutely required to state the name of the contractor. K.S.A. 60-1103(a)(1). Alliance's lien was defective for this reason.

Affirmed.

LEBEN, J., dissenting: I agree with all of the legal principles set out by the majority, but I cannot agree that Alliance lacked sufficient evidence that Grooms was a general contractor. Because reasonable minds can and *do* disagree with the district court's conclusion that Dunlap was the sole general contractor, I would reverse the judgment of the district court and remand the case for a trial where a fact-finder would resolve this genuine factual issue.

The Kansas Supreme Court reminded us only last month that we "must refrain from assessing witness credibility and weighing evidence" on a summary-judgment motion because those functions are the responsibility of the fact-finder at trial. "Summary judgment should not be used to prevent the necessary examination of conflicting testimony and credibility in the crucible of a trial." *Esquivel v. Watters*, 286 Kan. 292, Syl. ¶ 2, 183 P.3d 847 (2008). It is not an appellate court's function to weigh credibility where contradictory testimony exists. A leading treatise under the parallel federal rule also explains that when a specific basis is shown to

impeach the credibility of a witness on a key point, the issue should be left for trial:

"Clearly, if the credibility of the movant's witnesses is challenged by the opposing party and specific bases for possible impeachment are shown, summary judgment should be denied and the case allowed to proceed to trial, inasmuch as this situation presents the type of dispute over a genuine issue of material fact that should be left to the trier of fact." 10A Wright, Miller & Kane, Federal Practice and Procedure: Civil 3d § 2726, pp. 446-47 (1998).

Evidence here suggests that Grooms was a general contractor on this job, and there is ample basis on which to impeach the credibility of the contrary testimony. Grooms listed his own company, Associated Construction Services, as the general contractor on the "Jobsite Information Sheet." Thus, one of the two parties to the claimed contract between Grooms and the Pilands represented that there was, indeed, a contractual relationship between them. That's direct evidence that there was a contract between them, even though there may be some evidence to the contrary.

Grooms' own testimony, which the majority also cites, also provides corroborating evidence that he was the general contractor on this job:

- Grooms initially said it was accurate that his company was the general contractor before, perhaps realizing he hadn't wanted to say that, he interrupted the next question to say that "Mr. Dunlap's company was the *actual* general contractor." (Emphasis added.)
- Grooms said that he "did all of the estimating" and that he "was liaison to the customer."
- Grooms said that *he* supervised *Dunlap*, the putative general contractor: "I oversaw it, made sure that the dirt work was properly done, which Mr. Dunlap did that, and the concrete was placed properly and the building was erected properly." Grooms separately noted that "Mr. Dunlap poured the concrete." So Grooms apparently supervised all of the work that Dunlap did on the job.
- Grooms did not have a general contractor's business license, which meant that a licensed company would have to obtain the building permit. Grooms' lack of a license explains Dun-

lap's role in the official paperwork without negating the possibility—recognized by the majority—that Grooms also was a contractor. Grooms' own word choices were also specifically consistent with that scenario. When he was asked why he listed himself as the general contractor on the Jobsite Information Sheet, Grooms responded, "Well, I was doing business with Mr. Dunlap, I did not hold a general contractor's license at the time so *we were doing it through Mr. Dunlap's general contractor's license.*" (Emphasis added.) A fact-finder could certainly conclude that the "we" referred to Grooms and Dunlap, who acted together as contractors. A fact-finder could also certainly conclude that Grooms and Dunlap were engaging in unethical business deals by subverting the licensing laws.

- Grooms was asked whether "you needed somebody to do the general contracting?" He said he did, and he agreed that *he contacted Dunlap* to do that on a previous job and agreed to handle this one the same way. Once again, this is consistent with the theory that Grooms and Dunlap acted together as contractors.

- Grooms said that he was "[w]orking as an equal, being equal in responsibility for getting the job done" with Dunlap.

The evidence I have just reviewed provides direct and circumstantial evidence that Grooms was the general contractor on the project in all aspects except placement of a name on the building permit. In response, the defendants present Grooms' ultimate denial that he was the general contractor, as well as the testimony of Dunlap and the Pilands that Dunlap was the real contractor. Substantial bases are available on which to impeach this contrary testimony. The Pilands' testimony certainly can be impeached by their financial interests: if Grooms was a contractor on the job, the Pilands face potential liability for Alliance's lien of $54,673 plus interest. Grooms' testimony can be impeached by his inconsistent statements, the Jobsite Information Sheet, and his sketchy business practices. Dunlap's testimony can be impeached based upon his past relationship with Grooms and his potential desire for future business with Grooms or the Pilands.

In particular, the relationship between Dunlap and Grooms certainly raises credibility questions since they apparently have sought to avoid local licensing laws together. Grooms testified that an owner of another property on an earlier job "contracted *me* to do a plumbing warehouse for him" (emphasis added), but Grooms had Dunlap obtain the building permit because Grooms did not have a general contractor's business license. Dunlap could be fairly cross-examined based on this evidence about his potential interest in future business with Grooms in which Dunlap's contractor's license would be used to get building permits while Grooms did most of the work, including the day-to-day supervisory effort. Grooms certainly speaks in a manner consistent with a theory that Grooms was the general contractor but that he and Dunlap agreed to put the permits in Dunlap's name and work together on the project since Dunlap had the required business license:

"As far as putting up this building you have to have a general contractor's license to build something in Finney County and I did not have one and Mr. Dunlap and I had done a previous project that was worked the same way as far as *he bought the permits*." (Emphasis added.)

In this excerpt, Grooms testified that the permit had been "worked the same way" on the Pilands' project as on the prior one. As already noted, Grooms had testified that the owner in the other project had contracted *with Grooms* but that Dunlap obtained the permit. Undoubtedly, neither Grooms nor Dunlap would have an incentive to admit that they were subverting local licensing laws through their arrangements.

All of the evidence referenced here was properly cited by Alliance in its response to the summary-judgment motion. In it brief before the district court, Alliance explicitly claimed that "[b]ecause Grooms did not have a general contractor's license, he and Dunlap did the project together under Dunlap's general contractor license." The majority recognizes that more than one contractor can be on a job, and the majority recognizes that the contract between the owner and contractor may be express or implied and does not require a written document. Alliance presented sufficient evidence to support its claim that both Grooms and Dunlap were contractors

on this job. I would reverse the judgment of the district court and remand the case for trial.